**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re:<br><br>Philip Mitchell Brailsford<br>Corinne Elizabeth Brailsford<br><br>Debtors. | In Proceedings Under<br>Chapter 7<br><br>Case No. 2:19-bk-00802-BKM<br><br>Adversary No: |
| Laney, Sweet an individual; Laney Sweet, as Personal Representative of the Estate of Daniel Shaver; N.S., an individual minor; E.S., an individual minor,<br><br>Plaintiffs,<br><br>v.<br><br>Philip Mitchell Brailsford and Corrine Brailsford, husband and wife;<br><br>Defendants. | **ADVERSARY COMPLAINT** |

For their Complaint against Defendant Philip Mitchell Brailsford and Corrine Brailsford ("Debtor Brailsford"), Plaintiff Laney Sweet, an individual, on her own behalf and as guardian of Plaintiffs E.S. and N.S., the minor children of Daniel Shaver (deceased) and Plaintiff Laney Sweet, and also as personal representative of the Plaintiff Estate of Daniel Shaver alleges as follows:

a) Plaintiffs Laney Sweet, N.S., and E.S. are residents of the State of Colorado. Plaintiff Laney Sweet is an adult individual, and the widow of Daniel Shaver. Plaintiffs N.S. and E.S. are minors who are the natural born children of Ms. Sweet and Mr. Shaver. Ms. Sweet remains their guardian and is authorized to bring and prosecute the claims alleged herein on behalf of her children, N.S. and E.S. The Estate of Daniel Shaver is the estate of Ms. Sweet's deceased husband, Daniel Shaver, for which she is the personal representative. Plaintiffs Laney Sweet, N.S., E.S. and the Estate of Daniel Shaver are hereafter referred to as the "Creditor Plaintiffs."

b) Debtor Defendant Philip Mitchell Brailsford is a resident of the State of Arizona and a former Mesa Police Department Officer, Badge Number #19861.

c) Debtor Defendant Corrine Brailsford is also a resident of the State of Arizona. She and Debtor Defendant Philip Mitchell Brailsford are married, and were married at the times relevant to the allegations in this adversary complaint.

d) Debtor Defendant Philip Mitchell Brailsford and his wife, Defendant Corinne Brailsford, filed a Petition for Relief under Chapter 7 of the United States Bankruptcy Code on January 24, 2019 (the "Filing"). The use of the term "the Brailsford Debtors" used herein is intended to and does include both Debtor Defendants Philip Mitchell Brailsford and his wife, Defendant Corrine Brailsford, and to include their marital community.

e) This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334.

f) Venue is proper in the United States Bankruptcy Court for the District of Arizona pursuant to 28 U.S.C. § 1409(a). The Complaint is timely pursuant to Rule 4004, Federal Rules of Bankruptcy Procedure.

g) This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). To the extent that any allegations are deemed to relate to non-core proceedings, said allegations fall within the purview of 28 U.S.C. § 157(b)(4). The Creditor Plaintiffs consent to this Court's jurisdiction to enter findings of fact and conclusions of law to the extent the Court may rule on any non-core issues in this proceeding.

**GENERAL ALLEGATIONS**

h) Creditor Plaintiffs commenced a federal civil lawsuit in the United States District Court for the District of Arizona arising out of the wrongful seizure and killing of Daniel Shaver against Defendant Debtors Philip Mitchell Brailsford and Corrine Brailsford, as well as against the City of Mesa, Arizona, Christopher Doane and Jane Doe Doane, Brian Elmore and Jane Doe Elmore, Bryan Cochran and Jane Doe Cochran, and Richard Gomez and Jane Doe Gomez, Charles Langley and Jane Doe Langley, and Defendant LQ Management, L.L.C., d/b/a La Quinta Inns & Suites, along with various John and Jane Does, Black Corporations, White

Partnerships, and Unnamed Public Entities. The federal lawsuit has been assigned Case No. 2:17-cv-00152-GMS. It was consolidated with a lawsuit brought in the same court by Daniel Shaver's parents, Norma and Grady Shaver, arising out of the killing of Daniel Shaver, which is assigned Case No. CV-17-00715-PHX-GMS. The claims asserted by the Creditor Plaintiffs in Case No. 2:17-cv-00152-GMS are referred to herein as the "Federal Civil Lawsuit." [*See* Ex. A attached hereto, the Sweet Plaintiffs' Amended Complaint]. The Creditor Plaintiffs incorporate herein by reference their allegations in the Amended Complaint filed by them in the Federal Civil Lawsuit.

i) In the underlying Federal Civil Lawsuit, Creditor Plaintiffs are asserting the following facts and claims against the Brailsford Debtors:

1. Debtor Philip Mitchell Brailsford ("Debtor Brailsford") is a former Mesa Police Department ("MPD") Officer, Badge Number #19861, and is a resident of the State of Arizona. Debtor Brailsford killed Daniel Shaver by shooting him multiple times in Mesa, Arizona on January 18, 2016, and he is further responsible for other actions and omissions in Maricopa County, State of Arizona out of which the claims in this action arise. Corrine Brailsford is the spouse of Debtor Philip Mitchell Brailsford and they were married at all times material to the claims in this action. Debtor Philip Mitchell Brailsford was acting for and on behalf of his marital community at all times relevant to the claims herein and in taking the actions that resulted in the wrongful seizure and wrongful killing of Daniel Shaver. The marital community of Debtor Philip Mitchell Brailsford and Corrine Brailsford is therefore liable for all actions, omissions and damages alleged herein against Debtor Philip Mitchell Brailsford.

2. On January 18, 2016, Daniel Shaver ("Daniel" or "Mr. Shaver") was twenty-six years old. He and his wife, Creditor Plaintiff Laney Sweet, had been together since they first started dating in 2008, and they and their two minor children, Creditor Plaintiffs N.S. and E.S. resided together in Texas.

3. Daniel was a devoted father and husband, and his wife and children depended heavily on Daniel for love, affection, support, care, attention, protection, safety, security and all the other intangible benefits a loving father and spouse provides.

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

4. As a young, healthy man, Daniel should have had a long earnings and savings life ahead of him and his family had a right to expect his earnings and savings to grow substantially in future years.

5. As part of his job, Daniel traveled to places like Arizona to provide pest control services for "big box" stores. For his job, Daniel carried pellet rifles.

6. On January 18, 2016, Daniel Shaver was a registered, paying guest at the La Quinta Inn & Suites Mesa Superstition Springs hotel located at 6530 E. Superstition Springs, Blvd., Mesa, Arizona 85206 (the "La Quinta hotel").

7. The two pellet rifles Daniel traveled with for work were company property and, due to their expense, Daniel preferred to keep them in his room where they would be safe from anyone burglarizing cars in the hotel parking lot. Daniel's regular practice was to advise hotel staff that he had the pellet rifles with him and intended to keep them in his room.

8. On the evening of January 18, 2016, Daniel had his two work pellet rifles in his room at La Quinta. However, Daniel used the rifles for work and posed no threat to use the rifles to do harm to anyone else.

9. On information and belief, Daniel ordered food to La Quinta on the evening of January 18, 2016, and employees of the La Quinta observed Daniel and realized he was not acting violent or threatening in any way. After Daniel returned to his room, Daniel met two other registered La Quinta guests – Monique Portillo and Luis Nunez – and they joined Daniel in his room to socialize. The three struck up a conversation.

10. Sometime after Mr. Portillo and Ms. Nunez entered Daniel's room at the La Quinta hotel, a member of the La Quinta hotel staff placed a call to the local 911 emergency system and reported that someone had reported seeing an individual pointing a gun out of a window at the hotel. The caller could not identify where the gun was being pointed, did not report that the gun had been pointed at a person, or any particular target, and did not specify if the hotel staff had received a report of a gun protruding out of a window or just someone inside holding a gun that was pointing in the direction of the window.

11. The hotel staff did not treat the report they received as an active shooter situation. Instead, Ms. Leticia Jimenez, one of the hotel front desk employees, headed outside to confirm what room was involved.

12. Recognizing the room involved in the report as Mr. Shaver's room, and having seen him earlier that evening ordering food, and having seen the delivery person heading upstairs, Ms. Jimenez went up to Daniel's room, saw the door open, and saw what she believed may have been a potential sale of a firearm, not any sort of violent or threatening activity.

13. Members of the staff at La Quinta had met and interacted with Daniel personally and could have explained their knowledge of and interactions with Daniel to any member of the Mesa Police Department who would have asked what they knew or thought about Daniel. Had any Mesa Police Department officers asked the La Quinta staff who were familiar with Daniel about him they would have learned that Daniel was friendly and outgoing and not acting in a threatening or violent manner on the evening of January 18, 2016.

14. At around 9:15 p.m. on January 18, 2016, multiple Mesa City Police Department officers including Debtor Philip Mitchell Brailsford, along with Defendants in the Federal Civil Lawsuit, Langley, Doane, Elmore, Cochran and Gomez, arrived at the La Quinta hotel in response to the 911 call. Defendant Langley was the senior responding officer and took command of the other officers who arrived at the scene.

15. Defendant Langley coordinated an immediate action team of officers including Debtor Philip Mitchell Brailsford, Elmore, Doane, Cochran and Gomez to go and secure room #502 – Daniel Shaver's room. Those officers ultimately moved to the fifth floor of the La Quinta hotel and took positions outside room #502 under Defendant Langley's command.

16. At the time he arrived at the La Quinta hotel, Debtor Brailsford was a lightly experienced officer whose prior conduct and actions indicated a dangerous immaturity, an unwillingness or inability to exercise personal restraint, and a willingness to employ inappropriate, unwarranted and excessive levels of force and violence in his activities while on duty.

17. Debtor Brailsford had been involved in an excessive use of force in connection with an incident at a convenience store that was well known to MPD officials and gave them reason to question his fitness for duty, to know of his predilection for employing excessive degrees of violence and force, and to be on notice of his corresponding danger to the public.

18. On the night of January 18, 2016, Debtor Brailsford was carrying an AR-15 weapon as his duty weapon. On that rifle he had installed a customized dust cover bearing the interior inscription "You're Fucked" and bearing an exterior inscription bearing a Spartan helmet and the phrase "molon labe."

19. "Molon labe" is a classical Greek term translating as "come and take them", taken from a Greek tale stating the defiance of King Leonidas to lay down his weapons and surrender to an invading enemy. It is a phrase commonly associated with or adopted by opponents of firearms regulation to suggest an aggressive refusal to submit to firearms regulation, even to the point of resisting legal regulation with armed violence.

20. The Mesa Police Department and its officers, including Debtor Brailsford, were aware of serious and even deadly dangers presented to member of the public who are the subject of inappropriate police reactions or conduct, including the failure to fully and appropriately investigate and analyze facts and circumstances involved in matters to which the police respond.

21. Debtor Brailsford and the other officers on his team on the night of January 18, 2016, were well aware that by rushing to Daniel's room without conducting an appropriate investigation into the facts and circumstances, especially concerning what the hotel staff knew about Daniel, and about Daniel's activities and demeanor that evening, they were violating basic practices designed to protect both the officers, the public in the hotel, and Daniel and anyone else who was with him.

22. Debtor Brailsford was aware that neither he, nor anyone with him, had conducted an investigation into who Daniel was, or how he was behaving that evening, or especially what the hotel staff had seen of Daniel and the activities occurring in his room. Had they done that investigation, they would have learned what hotel staff knew about Daniel in general, about his

demeanor that evening, about his having just recently ordered food for his room, that the hotel staff had not considered the report by guests about a weapon to indicate any sort of active shooter situation, but that they had instead actually gone outside after hearing the report to identify the room involved, and even had, after realizing it was Daniel's room, sent Ms. Jimenez up to the room without any sort of police presence or protection. They also would have learned that Ms. Jimenez observed the door standing open, was able to see inside the room, and did not observe a threat of violence.

23. As a trained police officer, Debtor Brailsford and the other officers responding with him to the La Quinta were well aware that the improper selection and deployment of weaponry and tactics that either unnecessarily or inappropriately create or enhance anxiety, fear, misperceptions of threats or aggression, and confusion for police officers or those citizens with whom they interact create serious and sometimes deadly dangers to the police officers, the public, and the citizen subject with whom the police interact. These dangers have been well known in the police community for many decades, and have been the subject of well-established studies, policies, tactics, protocols and training regarding de-escalation techniques in policing. The Mesa Police Department's own training materials demonstrate the importance and broad recognition of these matters. The Mesa Police Department and its officers, including Debtor Brailsford, were responsible for knowing and employing such well-established policies, procedures, and tactics for the de-escalation of situations, including the de-escalation of anxiety, conflict, perceptions of threats or aggression, fear, and risks of confusion or misperception.

24. Debtor Brailsford selected an AR-15 and agreed to participate in an assault-type move against a hotel room by a heavily armed squad of police officers. Given his prior involvement with a use of force issue and the unauthorized messages he had placed on his duty weapon, the evidence indicates Debtor Brailsford irresponsibly and maliciously desired to create an environment of escalated fear and tension and threat using an assault-type weapon in a tightly confined place in which dozens of uninformed guests were likely in the line of fire of a powerful rifle like his.

25. Given especially the well-recognized need for de-escalation tactics and the use of less threatening and less-than-lethal weaponry and tactics under the actual circumstances involved at the La Quinta, Debtor Brailsford was knowingly and willfully disregarding his training and duties as a police officer to protect both his fellow officers and the public with whom he was interacting, especially Daniel Shaver, by voluntarily deploying an AR-15 and joining the rush to assault Daniel's room without any proper investigation. He had reason to know he was creating an unreasonably dangerous, and even deadly, situation by irresponsibly heightening the level of anxiety, aggression, threat, and confusion, and by tacitly encouraging the similar irresponsible behavior by his commanding officer, Langley, and his other fellow officers.

26. Debtor Brailsford, along with another officer in his group, were wearing and operating AXON body cameras, which captured the events leading to, and including, Debtor Brailsford's shooting of Daniel Shaver.

27. In the hallway outside Daniel's hotel room, Debtor Brailsford took up a position targeting his AR-15 on the people who left Daniel's hotel room. The senior police officer, Langley, used verbally aggressive shouting, commands and demeanor that were highly inconsistent with de-escalation techniques well-recognized as critical for the protection of both officers and citizens and reduction of the chances of a mistaken shooting and killing of an unarmed citizen.

28. Daniel was unarmed, and he and Ms. Portillo exited the hotel room in compliance with Langley's commands.

29. As Daniel and Ms. Portillo exited the hotel room and entered the hallway surrounded by the multiple MPD officers Defendant Langley stated, "Alright, if you make a mistake another mistake, there's a very severe possibility you're both going to get shot." He said this despite the fact that both individuals had complied with his direct instructions up until that point.

30. Daniel was obviously traumatized, frightened and submissive. Debtor Brailsford and the other officers could see this in his physical posture and movements and could hear it in

his voice when he tried to speak to them. Yet, when Daniel attempted to speak, Sergeant Langley said, "This is – shut up. I'm not here to be tactful and diplomatic with you. You listen, you obey. For one thing, did I tell you to move young man?" To which Daniel responded, "No, sir. No, sir. No, sir. No, sir."

31. As Defendant Langley continued to issue him orders, Daniel appeared both compliant and confused to all the MPD officers who could see him in the hallway. At one point, Defendant Langley ordered Daniel to place his hands on the back of his head and interlace his fingers. Daniel was again compliant.

32. Defendant Langley then told Daniel to cross his left foot over his right foot. Daniel complied with this but appeared to be confused as to which foot Defendant Langley had ordered him to cross. He crossed his feet both ways before finally crossing his feet as Defendant Langley had instructed. Daniel's actions showed he was concentrating on behaving just as the MPD officials wanted.

33. Defendant Langley then told Daniel, "if you move, we're going to consider that a threat and we are going to deal with it and you may not survive." This was the second threat against Daniel's life in a matter of minutes despite Daniel's repeated and unabated attempts to comply with the police instructions.

34. After the MPD officers took Monique Portillo into custody, Langley again told Daniel "to listen to his instructions and 'do not make a mistake.'" Defendant Langley expressed his clear belief and directives to his subordinate officers, including Debtor Brailsford, that they could and should shoot Daniel if he simply made a mistake.

35. Defendant Langley continued to confusingly instruct Daniel to make various bodily movements, such as requesting that Daniel push himself up to a kneeling position while also keeping his legs crossed. When Daniel accidentally uncrossed his legs while moving to a kneeling position, Sergeant Langley immediately shouted at Daniel to keep his legs crossed, to which Daniel crossed his legs, and said, "I'm sorry. I'm sorry. I just pushed my --." Defendant Langley did not let Daniel complete his sentence.

36. Daniel then apparently put his hands behind his back as if waiting to be handcuffed, at which point Defendant Langley started screaming about Daniel's hands, even though his initial commands of what Daniel should do with his hands were loud and indiscernible.

37. Defendant Langley shouted for Daniel to place his hands in the air and Daniel "complied and rapidly put his hands above his head." Then Daniel said, "No, please do not shoot me. I'm … I'm trying to just do what you-" in a voice that, according to the Mesa Police investigating detective, Detective Sipe, "appeared to be panicked."

38. At that point, the MPD officers near Daniel in the hallway, including without limitation Debtor Brailsford, could hear Daniel audibly sobbing including when he said "yes sir," in response to Defendant Langley's question about whether he understood what he was being told to do.

39. Debtor Brailsford knew that his actions and those of his fellow officers had escalated the situation gravely and had created in a young man serious fear that he was going to be killed. Debtor Brailsford, along with his fellow officers, should have known from his training that he and his fellow officers had now created a situation in which the anxiety, fear, aggression and confusion for everyone involved had been escalated and that chances of a wrongful shooting had substantially increased. But, Debtor Brailsford and his fellow officers showed no regard for the dangers they had created, and Debtor Brailsford took no actions to suggest to Defendant Langley that he deescalate the situation or to otherwise mitigate the severe risks they had now created to the unarmed Daniel.

40. Defendant Langley then shouted at Daniel to crawl towards him. Again, displaying his prompt and respectful compliance with the police commands, Daniel dropped to his hands and knees and could audibly be heard sobbing and stating 'Yes, sir' by the MPD officers as he began to crawl forward.

41. The MPD officers had already taken Monique Portillo into custody. Defendant Langley commanded Monique Portillo to crawl toward them, and then had Defendant Gomez

walk forward to take her into their custody when she "was approximately no more than 6 feet in front of us," per Defendant Langley.

42. When the MPD officers had taken her into custody, they left her purse on the floor of the hallway in the direct path that Defendant Langley was ordering Daniel to crawl on. In fact, when Debtor Brailsford shot Daniel, Daniel collapsed on the purse.

43. Leaving the purse in the hallway was reckless and negligent, inappropriate, and violated the standard of care for police work. On information and belief, it was inevitable and imminently foreseeable that someone having to crawl over or around a purse obstructing their path would make movements of their arms and/or legs, and that, given Defendant Langley's admonitions, one or more of his officers might wrongly open fire and hurt or kill Daniel Shaver without justification. Neither Debtor Brailsford, nor his fellow officers, took any actions to remove the purse that was obvious to all of them, or reduce the risk that now Daniel would have to make moves to avoid the purse that someone might consider a threat. This constituted a conscious disregard for an obvious deadly threat to Daniel.

44. At the time Daniel was crawling in the hotel hallway, his athletic shorts had fallen considerably down his rear end, exposing significantly his underwear. This would have provided further confirmation to Debtor Brailsford that Daniel had no weapon hidden on him, especially not in the waistband of his shorts. There was no reason for the Debtor Brailsford to believe that Daniel was carrying a weapon of any kind – whether a rifle as described in the 911 call or something else.

45. In fact, the last words Daniel said was the submissive phrase: "Yes, sir. Please." But then, Debtor Brailsford killed him with five rounds fired from his AR-15 weapon as Daniel was crawling on the ground and audibly sobbing.

46. No other officer present fired their weapon. Officer Elmore carried an AR-15 and did not fire. Sergeant Langley carried an AR-15 which was not fired. Officer Doane, armed with a less lethal taser, did not fire. There was no reason for anyone to fire. Daniel did nothing to warrant being shot.

47. Daniel's killing was therefore unprovoked, unwarranted, unjustified, callous, depraved, vicious and evil. It reflected a conscious decision by Debtor Brailsford to intentionally shoot an unarmed and innocent man who was complying with police orders, sobbing, and begging not to be shot. The fact that Debtor Brailsford made the decision to shoot Daniel five times after having earlier taken intentional actions, and intentionally failed to take mitigating actions, that had caused the tension, anxiety, fear, aggression, and confusion in the situation to unnecessarily and improperly escalate, knowing this created substantial risks that he or other officers would make a deadly mistake and shoot Daniel, demonstrates that Debtor Brailsford's actions were particularly malicious, callous and grossly inappropriate and severe. They were evil.

48. Daniel Shaver did not pose a threat of harm justifying his being shot or even his being targeted with multiple rifles and other weaponry while being verbally berated and threatened with being shot.

49. The seizure and shooting of Daniel Shaver by Debtor Brailsford violated the standards of care, standards of practice, and constitutional and other legal restrictions governing Debtor Brailsford's interactions with Daniel Shaver, including the law prohibiting wrongful seizure by police officers, the standards governing police investigation and assessment of incidents and selection of proper weaponry, tactics and levels of force to employ under circumstances like those at the La Quinta on the night of January 18, 2016, the standards and practices for de-escalation during interactions between police and citizens, and the standards governing use of deadly force like that employed by Debtor Brailsford. At a minimum, Debtor Brailsford's actions meet the tests for negligence. But they also constitute reckless actions, intentional wrongful conduct, deliberate indifference, malicious conduct, extreme and outrageous conduct, and purposefully and knowingly wrongful conduct.

50. The Creditor Plaintiffs Laney Sweet and her minor children are survivors who may file an action arising out of the wrongful death of Daniel Shaver under Arizona law, including A.R.S. § 12-612. The Creditor Plaintiffs are entitled to an award of their compensatory, actual, consequential and incidental damages arising out of the wrongful

conduct of Debtor Brailsford as alleged herein. Moreover, the actions and omissions of Debtor Brailsford that form the basis for the Creditor Plaintiffs' claims in the Federal Civil Lawsuit, as described in the Amended Complaint in the Federal Civil Lawsuit and herein, constitute malicious, evil conduct intentionally and knowingly undertaken despite the known risks that they posed a substantial risk of extreme and deadly harm to Daniel Shaver. The Creditor Plaintiffs are therefore entitled to recover punitive damages against the Brailsford Debtors in an amount sufficient to adequately punish Debtor Brailsford and deter like future conduct by him and others.

51. The Creditor Plaintiffs are also entitled to judgment in their favor and against the Brailsford Debtors on claims under 42 U.S.C. § 1983 for violation of the Creditor Plaintiffs' rights under the law, and are entitled to an award against the Brailsford Debtors for all the Creditor Plaintiffs' compensatory, actual, consequential, and incidental damages and harms resulting from violation of the Creditor Plaintiffs' rights under the law. Moreover, the actions and omissions of Debtor Brailsford that form the basis for the Creditor Plaintiffs' claims in the Federal Civil Lawsuit, as described in the Amended Complaint in the Federal Civil Lawsuit and herein, constitute malicious, evil conduct intentionally and knowingly undertaken despite the known risks that they posed a substantial risk of extreme and deadly harm to Daniel Shaver. The Creditor Plaintiffs are therefore entitled to recover punitive damages against the Brailsford Debtors in an amount sufficient to adequately punish Debtor Brailsford and deter like future conduct by him and others.

52. The Creditor Plaintiffs are further entitled to an award of their reasonable attorneys' fees and costs incurred in pursuit of such claims pursuant to 42 U.S.C. § 1988.

53. The Creditor Plaintiffs Laney Sweet, E.S. and N.S. are also entitled to judgment in their favor and against the Brailsford Debtors on claims for Intentional Infliction of Emotional Distress under Arizona common law, and are entitled to recovery of all their compensatory, actual, consequential, and incidental damages and harms against the Brailsford Debtors resulting from the emotional distress Debtor Brailsford intentionally inflicted against them in connection with the unjustified and unwarranted seizure and killing of Daniel Shaver.

Moreover, the actions and omissions of Debtor Brailsford that form the basis for the Creditor Plaintiffs' claims in the Federal Civil Lawsuit, as described in the Amended Complaint in the Federal Civil Lawsuit and herein, constitute malicious, evil conduct intentionally and knowingly undertaken despite the known risks that they posed a substantial risk of extreme and deadly harm to Daniel Shaver. The Creditor Plaintiffs are therefore entitled to recover punitive damages against the Brailsford Debtors in an amount sufficient to adequately punish Debtor Brailsford and deter like future conduct by him and others.

54. As a direct and proximate result of Debtor Brailsford's actions as alleged herein, the Creditor Plaintiffs suffered grave and devastating injuries and loss, including the loss of Daniel Shaver's life. Debtor Brailsford's conduct in connection with the seizure and killing of Daniel Shaver has required the Creditor Plaintiffs to incur substantial costs, and has deprived Creditor Plaintiffs Laney Sweet and N.S. and E.S. of the husband and father they loved, of his care and affection, of his emotional support, financial support, wages, benefits and other economic compensation. Those damages are permanent and ongoing and will continue long into the future. Creditor Plaintiff Laney Sweet has also had her ability to earn income and benefits wrongfully disrupted and impaired by Debtor Brailsford's wrongful actions.

55. The Creditor Plaintiffs are entitled to full compensation for their harms, losses, damages, injuries and violation of their rights by the Brailsford Debtors.

56. In addition to the claims asserted above, the Creditor Plaintiffs also asserted other claims in the Federal Civil Lawsuit which have been subject to adverse ruling on the defendants' motions to dismiss. These claims include claims by Laney Sweet, N.S. and E.S. against Defendant City of Mesa and against the Langley defendants, the Brailsford Debtors, the Doane defendants, the Cochran defendants, and the Elmore and Gomez defendants: 1) under 42 U.S.C. § 1983 for violation of First Amendment rights; and 2) for conspiracy to interfere with civil rights. They also include claims by the Estate of Daniel Shaver against Defendant City of Mesa and against the Langley defendants, the Brailsford Debtors, the Doane defendants, the Cochran defendants, and the Elmore and Gomez defendants for: 1) intentional infliction of emotion distress; 2) assault; and 3) battery. They also include claims by Laney Sweet against

the City of Mesa for violation of the Arizona public records laws; and claims by Laney Sweet, E.S. and N.S. against the City of Mesa for violation of the Arizona crime victims' rights laws. Nothing in this complaint is intended to waive, limit, or impair any such additional claims, or the right of any of the Creditor Plaintiffs to seek appeal and reversal of any rulings dismissing or rejecting such claims. The Creditor Plaintiffs therefore preserve all such claims and rights to the maximum extent provided by law.

57. Defendants in the Federal Civil Lawsuit attempted to obtain dismissal of all the claims the Creditor Plaintiffs have alleged against them, but the District Court has ruled that the Creditor Plaintiffs may proceed with the following claims:

    A. Claims by Creditor Plaintiffs Laney Sweet, N.S. and E.S. for Wrongful Death under A.R.S. § 12-611, et seq. against all Defendants, including the Brailsford Debtors.

    B. Claims by all Creditor Plaintiffs for violation of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983 against Defendant City of Mesa and against the Langley defendants, the Brailsford Debtors, the Doane defendants, the Cochran defendants, and the Elmore and Gomez defendants.

    C. Intentional Infliction of Emotional Distress against all Defendants, including the Brailsford Debtors, for claims by Laney Sweet, E.S. and N.S.

The Creditor Plaintiffs have therefore stated in their pleading in the Federal Civil Lawsuit the basis for recovery against the Brailsford Debtors on claims for Wrongful Death, Violation of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983, and Intentional Infliction of Emotional Distress, and the Creditor Plaintiffs are entitled to full recovery of their damages and other relief set forth above under each of those claims.

58. The parties in the Federal Civil Lawsuit have completed certain written and deposition discovery, and are currently litigating stay requests by the Defendants seeking to stop the remaining depositions.

## COUNT ONE

### (Nondischargeability under 11 U.S.C. § 523(a)(6))

59. Debtor Brailsford willfully, callously and maliciously injured Creditor Plaintiffs through Debtor Brailsford's actions in violating the standards of care and the constitutional and other legal duties applicable to his position as a police agent for the City of Mesa, causing the death of Daniel Shaver.

60. Debtor Brailsford intended the consequences of all his wrongful actions. As examples of those intended consequences, but without limitation, Debtor Brailsford intended to arm himself with and use an AR-15 against Daniel Shaver, and to deploy an inappropriately dangerous and aggressive assault approach without sufficient investigation of or consideration to the facts and circumstances relevant to the situation at the La Quinta on January 18, 2016. He thereby created an unreasonable risk of escalation, fear and aggression by him and others that would lead to a wrongful shooting of an unarmed citizen. He then further intended to allow Sergeant Langley to further escalate an already inappropriately overcharged situation by using inappropriate and highly dangerous and aggressive commands, tactics and demeanor. And, Debtor Brailsford intended to allow Daniel Shaver to be forced to crawl forward into a heavily armed and overly aggressive and agitated group of police officers, under instructions to shoot him if he moved his arms, with an obvious obstruction in the way, creating a grave danger that Daniel would make a physical move that would be misinterpreted as a threat, causing his death. Finally, Debtor Brailsford intentionally shot Daniel Shaver, without justification or provocation, and he knew that there was a substantial likelihood that by pulling the trigger on his AR-15 while pointed at Daniel Shaver, Mr. Shaver would be injured and killed by his actions and thus deprived of his life, liberty and property without due process of law.

61. As a trained police officer, Debtor Brailsford aimed and fired his AR-15 rifle at Daniel Shaver with the intention to kill or seriously injure him.

62. Thus, Debtor Brailsford knew that the deadly consequences of his actions were certain or substantially certain to result from his conduct.

63. In addition to the intentional, willful and malicious conduct described above, the actions of Debtor Brailsford as alleged herein also constituted unnecessary and wanton infliction of pain and suffering and created an unreasonable risk of harm to Daniel Shaver and the Creditor Plaintiffs with the highly probable result that the harm would occur.

64. The actions of Debtor Brailsford caused injury to Daniel Shaver and Creditor Plaintiffs Laney, N.S. and E.S., and was done without just cause or excuse. Instead, Daniel Shaver was compliant at all times with the MPD officer's commands, never posed any threat to Debtor Brailsford, was never armed with a weapon of any sort, and was crawling on the ground while audibly sobbing.

65. The Creditor Plaintiffs believe that the Brailsford Debtors may claim entitlement to indemnification, in full or in part, from Debtor Brailsford's former employer, the City of Mesa, or from insurance, or both for costs of defending against the claims of the Creditor Plaintiffs and for the Brailsford Debtors' liability and any eventual judgment against them in connection with the claims and damages asserted by the Creditor Plaintiffs.

66. Debtor Brailsford's willful and malicious actions thus justify an order from this Court declaring any liabilities and future debt(s) owed for judgment entered against Debtor Brailsford and in favor of Creditor Plaintiffs Laney Sweet, N.S., E.S., and/or the Estate of Daniel Shaver as non-dischargeable, particularly pursuant to 11 U.S.C. § 523(a)(6).

WHEREFORE, Creditor Plaintiffs Laney Sweet, N.S., and E.S., and the Estate of Daniel Shaver, request that the Court enter a non-dischargeable judgment against Debtors Philip Mitchell Brailsford and Corinne Brailsford as follows:

A. Awarding the Creditor Plaintiffs all their actual, compensatory, consequential and incidental damages, to the maximum extent allowed by law, and in amounts to be proven at trial under all their claims as alleged herein and in the Federal Civil Lawsuit;

B. Awarding the Creditor Plaintiffs punitive damages in an amount sufficient to punish Debtor Brailsford and to deter like similar conduct by others;

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

C.  Awarding the Creditor Plaintiffs interest on all amounts awarded at the highest rates and from the earliest dates allowed by law;

D.  Awarding the Creditor Plaintiffs their reasonable attorneys' fees and taxable costs, pursuant to 42 U.S.C. § 1988 or as otherwise allowed by law;

E.  Decreeing that the Brailsford Debtors' liability and indebtedness to the Creditor Plaintiffs is non-dischargeable, including pursuant to 11 U.S.C. §§ 523(a)(6);

F.  Awarding the Creditor Plaintiffs such other and further relief as the Court deems just and proper.

The Creditor Plaintiffs consent to this Court's entry of final orders and/or judgment as set forth in the prayer for relief above.

RESPECTFULLY SUBMITTED this 26th of April, 2019.

BASKIN RICHARDS PLC

/s/ Alan S. Baskin
William A. Richards
Alan S. Baskin
Shayna G. Stuart
2901 N. Central Avenue, Suite 1150
Phoenix, AZ 85012
*Attorneys for Plaintiffs*