# EXHIBIT A

**BASKIN RICHARDS PLC**
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona  85012
Telephone No. 602-812-7979
Facsimile No. 602-595-7800
E-mail: brichards@baskinrichards.com
          dwood@baskinrichards.com
          lross@baskinrichards.com
Name and Arizona State Bar No.:
William A. Richards #013381
David E. Wood #21403
Leslie Ross #027207
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| LANEY SWEET, an individual; E.S., a minor; N.S., a minor; ESTATE OF DANIEL SHAVER; <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF MESA, ARIZONA, an Arizona municipal corporation; PHILIP MITCHELL BRAILSFORD and CORRINE BRAILSFORD, husband and wife; CHARLES J. LANGLEY and JANE DOE LANGLEY, husband and wife; BRIAN ELMORE and JANE DOE ELMORE, husband and wife; CHRISTOPHER DOANE, and JANE DOE DOANE, husband and wife; BRYAN COCHRAN and JANE DOE COCHRAN, husband and wife; RICHARD GOMEZ and JANE DOE GOMEZ, husband and wife; LQ MANAGEMENT L.L.C.; JOHN DOES I-X; JANE DOES I-X; WHITE CORPORATIONS I-X; UNNAMED PUBLIC ENTITIES I-X; <br><br> Defendants. | No. 2:17-cv-00152-GMS <br> **LEAD CASE** <br><br> **CONSOLIDATED WITH:** <br> No. CV-17-00715-PHX-GMS <br><br> **AMENDED COMPLAINT** <br><br> (JURY TRIAL DEMANDED) |

1  GRADY SHAVER, et al.,

2                                              Plaintiffs,

3  v.

4  CITY OF MESA, et al.

5

6                                              Defendants.
   _____

7        Plaintiff Laney Sweet, an individual, on her own behalf and as guardian of Plaintiffs

8  E.S. and N.S., and as representative of the Plaintiff Estate of Daniel Shaver, and for her claims

9  against Defendants the City of Mesa, Arizona, Philip M. Brailsford and Corrine Brailsford,

10 Charles J. Langley and Jane Doe Langley, Brian Elmore and Jane Doe Elmore, Christopher

11 Doane and Jane Doe Doane, Bryan Cochran and Jane Doe Cochran, Richard Gomez and Jane

12 Doe Gomez, LQ Management L.L.C., and John Does I-X, Jane Does I-X, White Corporations

13 I-X and Unnamed Public Entities I-X hereby alleges:

14                                    **THE ACTION**

15       1.     This is a civil action under the Arizona wrongful death statutes, A.R.S. § 12-611,

16 *et seq.*, 42 U.S.C. § 1983, and the statutes and common law of the State of Arizona.  The

17 Plaintiffs seek hereby full relief and compensation for all the past, present and future losses

18 and harms caused to the Plaintiffs by the actions and failures to act of the Defendants alleged

19 herein, including those actions and omissions: 1) undertaken by the Defendants under color of

20 law with the intent and for the purpose of depriving the Plaintiffs of rights secured by the

21 Constitution and laws of the United States; 2) undertaken by the Defendants under color of law

22 with the intent and for the purpose of depriving the Plaintiffs of rights secured by the

23 Constitution and laws of the State of Arizona; 3) undertaken by the Defendant City of Mesa

24 and its agents for the purpose of retaliating against the Plaintiff Laney Sweet for the exercise

25 by her of her free speech, crime victim's rights and rights under the public records laws of the

26 State of Arizona; 4) undertaken by the Defendants in violation of the rights of the Plaintiffs

27 and the Defendants' duties under applicable state statutes and common law to prevent the

28 wrongful killing of Daniel Shaver in Arizona on January 18, 2016, and to protect the Plaintiffs

from harm caused by that wrongful killing; 5) undertaken by Defendants or their agents to create false and misleading representations about the circumstances of the killing of Daniel Shaver, to prevent the uncovering by Plaintiffs of the true facts regarding Daniel Shaver's killing, and to otherwise interfere with the Plaintiffs' rights and abilities to seek full redress for all harms and losses caused by the Defendants; and 6) that involve the Defendants refusing or neglecting to prevent the rights deprivations and denials asserted herein to the Plaintiffs.

2.      The individual Defendants are sued in both their individual and official capacities. The City of Mesa is sued as a result of the actions or failures to act of its agents, including the individual Defendants, as alleged herein, that occurred within the scope of such agents' authority and work for the City of Mesa, and which was either caused by or ratified by the City of Mesa.

### THE PARTIES

3.      Plaintiff Laney Sweet ("Laney" or "Ms. Sweet") is an adult individual, a resident of Texas, and the widow of Daniel Shaver. Mr. Shaver and Ms. Sweet were married pursuant to the laws of the State of Texas and pursuant to the Full Faith and Credit Clause of the United States Constitution, U.S. Const., Art. IV, § 1, the State of Arizona must honor that marriage. Ms. Sweet therefore has all rights attendant to a spouse under Arizona and federal law.

4.      Plaintiffs E.S. and N.S. are minors who are the natural born children of Ms. Sweet and Mr. Shaver.  Ms. Sweet remains their guardian.

5.      The City of Mesa (the "City") is an Arizona municipality, organized according to and operating pursuant to the laws of the State of Arizona. The City is a governmental entity and acted through its agents at all times relevant to the claims herein as a government entity. On information and belief, the agents of the City whose actions and omissions, as alleged herein, form the basis for the Plaintiffs' claims were acting at all material times with the consent and authorization of and according to the training and policies of the City.

6.      The City of Mesa Police Department ("MPD") is a department of the City and operated through its departmental employees as an arm of the City at all times relevant to the claims herein.  Because the MPD is a department of the City of Mesa, the actions of the MPD

and its agents that form the basis of the claims herein are attributed to the City of Mesa for purposes of all federal and state law claims. *See Williams v. City of Mesa Police Dep't*, No. 09-1511, 2009 U.S. Dist. LEXIS 80391, at \*8, 2009 WL 2568640, at \*3 (D. Ariz. Aug. 18, 2009); *see also Joseph v. Dillard's, Inc.*, 2009 U.S. Dist. LEXIS 120577, at \*15, 2009 WL 5185393 (D. Ariz. Dec. 23, 2009); *Flores v. Maricopa County*, No. 09-0945, 2009 U.S. Dist. LEXIS 61713, at \*\*5-6, 2009 WL 2169159, at \*2 (D. Ariz. July 17, 2009).

7.     Defendant Philip Mitchell Brailsford ("Brailsford") is a former MPD Officer, Badge Number #19861, and is a resident of the State of Arizona.  Philip Mitchell Brailsford killed Daniel Shaver by shooting him multiple times in Mesa, Arizona on January 18, 2016, and he is further responsible for other actions and omissions in Maricopa County, State of Arizona out of which the claims in this action arise.  Corrine Brailsford is the spouse of Philip Mitchell Brailsford and they were married at all times material to the claims in this action. Philip Mitchell Brailsford was acting for and on behalf of his marital community at all times relevant to the claims herein and in taking the actions that resulted in the killing of Daniel Shaver.  The marital community of Philip Mitchell Brailsford and Corrine Brailsford is therefore liable for all actions, omissions and damages alleged herein against Philip Mitchell Brailsford.

8.     Defendant Charles J. Langley ("Langley") is a former MPD Officer, Badge Number #10509, and is a resident of the State of Arizona. Langley was present and commanded a contingent of MPD officers of which Philip Mitchell Brailsford was a member when Brailsford killed Daniel Shaver on January 18, 2016, and he is responsible for actions and omissions in Maricopa County, State of Arizona out of which the claims in this action arise.  On information and belief, Jane Doe Langley is the spouse of Charles J. Langley and they were married at all times material to the claims in this action.  The Plaintiffs reserve the right to substitute the proper name for Jane Doe Langley when it is discovered in the course of this action.  On information and belief, Charles J. Langley was acting for and on behalf of his marital community at all times relevant to the claims herein, and, therefore, the marital

community of Charles J. Langley and Jane Doe Langley is liable for all actions, omissions and damages alleged herein against Charles J. Langley.

9. Defendant Brian Elmore ("Elmore") is an MPD Officer, Badge Number #19456, and is a resident of the State of Arizona. Elmore was present and participating as a contingent of MPD officers of which Philip Mitchell Brailsford was a member when Brailsford killed Daniel Shaver on January 18, 2016, and Elmore is responsible for actions and omissions in Maricopa County, State of Arizona out of which the claims in this action arise. On information and belief, Jane Doe Elmore is the spouse of Brian Elmore and they were married at all times material to the claims in this action. The Plaintiffs reserve the right to substitute the proper name for Jane Doe Elmore when it is discovered in the course of this action. On information and belief, Brian Elmore was acting for and on behalf of his marital community at all times relevant to the claims herein, and, therefore, the marital community of Brian Elmore and Jane Doe Elmore is liable for all actions, omissions and damages alleged herein against Brian Elmore.

10. Defendant Christopher Doane ("Doane") is an MPD Officer, Badge Number #20111, and is a resident of the State of Arizona. Doane was present and a member of a contingent of MPD officers of which Philip Mitchell Brailsford was a member when Brailsford killed Daniel Shaver on January 18, 2016, and Doane is responsible for actions and omissions in Maricopa County, State of Arizona out of which the claims in this action arise. On information and belief, Jane Doe Doane is the spouse of Christopher Doane and they were married at all times material to the claims in this action. The Plaintiffs reserve the right to substitute the proper name for Jane Doe Doane when it is discovered in the course of this action. On information and belief, Christopher Doane was acting for and on behalf of his marital community at all times relevant to the claims herein, and, therefore, the marital community of Christopher Doane and Jane Doe Doane is liable for all actions, omissions and damages alleged herein against Christopher Doane.

11. Defendant Bryan Cochran ("Cochran") is an MPD Officer, Badge Number #12353, and is a resident of the State of Arizona. Cochran was present and was a member of

a contingent of MPD officers of which Philip Mitchell Brailsford was a member when Brailsford killed Daniel Shaver on January 18, 2016, and Cochran is responsible for actions and omissions in Maricopa County, State of Arizona out of which the claims in this action arise.  On information and belief, Jane Doe Cochran is the spouse of Bryan Cochran and they were married at all times material to the claims in this action.  The Plaintiffs reserve the right to substitute the proper name for Jane Doe Cochran when it is discovered in the course of this action.  On information and belief, Bryan Cochran was acting for and on behalf of his marital community at all times relevant to the claims herein, and, therefore, the marital community of Bryan Cochran and Jane Doe Cochran is liable for all actions, omissions and damages alleged herein against Bryan Cochran.

12.     Defendant Richard Gomez ("Gomez") is an MPD Officer, Badge Number #15089, and is a resident of the State of Arizona.   Gomez was present and was a member of a contingent of MPD officers of which Philip Mitchell Brailsford was a member when Brailsford killed Daniel Shaver on January 18, 2016, and Gomez is responsible for actions and omissions in Maricopa County, State of Arizona out of which the claims in this action arise. On information and belief, Jane Doe Gomez is the spouse of Richard Gomez and they were married at all times material to the claims in this action.  The Plaintiffs reserve the right to substitute the proper name for Jane Doe Gomez when it is discovered in the course of this action.  On information and belief, Richard Gomez was acting for and on behalf of his marital community at all times relevant to the claims herein, and, therefore, the marital community of Richard Gomez and Jane Doe Gomez is liable for all actions, omissions and damages alleged herein against Richard Gomez.

13.     Defendant LQ Management L.L.C. ("LQ Management") is a company and, on information and belief, the manager and operator of a La Quinta Inn & Suites hotel at 6530 E. Superstition Springs Boulevard in Mesa, Arizona which was the site of the killing of Daniel Shaver on January 18, 2016.  On information and belief, LQ Management is doing business and was doing business in Arizona at all times relevant to the claims alleged herein. On information and belief, LQ Management has taken on full management and operation,

including all such corresponding legal duties, of the La Quinta Inn & Suites hotel at 6530 E. Superstition Springs Boulevard in Mesa, Arizona and that hotel's employees and staff through a contractual arrangement with the hotel owner. On information and belief, LQ Management, including through the actions and omissions of its agents, is responsible for actions or omissions that lead to the damages claimed by the Plaintiffs in this action against LQ Management and LQ Management has an indemnification obligation to the owner of the hotel with respect to claims arising out of or related to its management and operation of the hotel.

14.    Defendants John Does I-X and Jane Does I-X are individuals whose true names are not yet known to the Plaintiff but whose actions or omissions may have contributed to or caused harms and damages to the Plaintiffs in connection with the killing of Daniel Shaver, any attempts to cover-up the true facts regarding Daniel's killing, or in connection with any attempts to publicly disparage Mr. Shaver and his family and to inflict emotional pain and suffering on Mr. Shaver's family by false and disparaging statements made about Mr. Shaver or his conduct.  Plaintiffs hereby reserve all rights to substitute the true names of such defendants as they are identified and to amend or supplement the allegations herein in connection with any claims or causes of actions Plaintiffs may assert against such defendants.

15.    Defendants White Corporations I-X are corporate entities, which may be corporations, limited liability companies, partnerships, general partnerships, limited partnerships, or other forms of incorporated, registered or licensed entities whose true names are not yet known to the Plaintiff but whose actions or omissions may have contributed to or caused harms and damages to the Plaintiffs in connection with the killing of Daniel Shaver, any attempts to cover-up the true facts regarding Daniel's killing, or in connection with any attempts to publicly disparage Mr. Shaver and his family and to inflict emotional pain and suffering on Mr. Shaver's family by false and disparaging statements made about Mr. Shaver or his conduct.  Plaintiffs hereby reserve all rights to substitute the true names of such defendants as they are identified and to amend or supplement the allegations herein in connection with any claims or causes of actions Plaintiffs may assert against such defendants.

16.     Unnamed Government Entities I-X are governmental agencies, offices, departments, or political subdivisions or entities whose true identities are not yet known to the Plaintiff but whose actions or omissions may have contributed to or caused harms and damages to the Plaintiffs in connection with the killing of Daniel Shaver, any attempts to cover-up the true facts regarding Daniel's killing, or in connection with any attempts to publicly disparage Mr. Shaver and his family and to inflict emotional pain and suffering on Mr. Shaver's family by false and disparaging statements made about Mr. Shaver or his conduct.

### JURISDICTION AND VENUE

17.     The actions or omissions that form the basis for the Plaintiffs' claims herein occurred in Maricopa County in the State of Arizona.  The Court has jurisdiction over the claims alleged herein pursuant to 28 U.S.C. §§ 1331 and 1343 for claims arising under 42 U.S.C. §§ 1983, 1985 and 1988.  The Court has supplemental jurisdiction over the Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

18.     Venue in this Court is appropriate under 28 U.S.C. § 1391(b)(2) because the City of Mesa, Arizona is located within this District, the individual Defendants, on information and belief, all reside within this District, Defendant LQ Management is licensed to do business in this District and manages and operates numerous hotels here, and because the acts giving rise to the causes of action asserted herein occurred in the District of Arizona.

### COMPLIANCE WITH NOTICE OF CLAIM REQUIREMENTS

19.     The Plaintiffs have complied with the requirements of A.R.S. §§ 12-821 and 12-821.01, having served an appropriate Notice of Claim and Amended Notice of Claim in accordance with the requirements of Arizona law. The parties on whom the Notice of Claim was served did not respond to the Notice of Claim, and have not offered to resolve the Plaintiffs' claims in any way.  Thus, the claims are ripe and appropriate for resolution through the courts.

### DANIEL SHAVER AND HIS FAMILY

20.     On January 18, 2016, Daniel Shaver ("Daniel" or "Mr. Shaver") was twenty-six years old.  He and his wife Laney Sweet, had been together since they first started dating in 2008, and they and their two minor children resided together in Texas.

21.     Daniel was a devoted father and husband, and his wife and children depended heavily on Daniel for love, affection, support, care, attention, protection, safety, security and all the other intangible benefits a loving father and spouse provides.

22.     Daniel Shaver also possessed a unique and charismatic personality. He found it incredibly easy to approach people he had not met before and quickly turn them into friends. Other people responded enthusiastically to the genuine interest Daniel always showed in others.

23.     On January 18, 2016, Daniel was also an employee of Animal Relocators of Texas which he served as a professional pest eradication specialist. Daniel's family materially benefitted from and depended on his income to support their day-to-day living, and they intended to continue to rely on Daniel's income.

24.     Daniel's work income allowed Daniel and Laney to provide their girls a comfortable home, good food, clothing, gifts and enriching experiences. Daniel and Laney were economically careful, and they hoped someday to help their daughters financially to obtain an education, travel or otherwise follow their own dreams as adults. The family household depended on Daniel as the breadwinner. Daniel's family relied upon Daniel's income to financially support their day to day living.

25.     As a young, healthy man, Daniel should have had a long earnings and savings life ahead of him and his family had a right to expect his earnings and savings to grow substantially in future years.

26.     As part of his job, Daniel traveled to places like Arizona to provide pest control services for "big box" stores.  For his job, Daniel carried pellet rifles.

**DANIEL'S STAY AT AND INTERACTIONS WITH LQ MANAGEMENT PERSONNEL**

27.     On January 18, 2016, Daniel Shaver was a registered, paying guest at the La Quinta Inn & Suites Mesa Superstition Springs hotel located at 6530 E. Superstition Springs, Blvd., Mesa, Arizona 85206 (the "La Quinta hotel").

28.     Daniel had been a registered guest of the La Quinta hotel the day before as well, having checked in on January 17, 2016.  He was planning to remain at the La Quinta for approximately three days while in Mesa completing his work for Animal Relocators of Texas.

29.     Daniel had been a guest of the same La Quinta hotel previously when he had traveled to the Phoenix metropolitan area as part of his work as a commercial pest control specialist.  Daniel has also stayed with his family at the same La Quinta hotel on a prior trip.

30.     Through his interactions with staff at the La Quinta hotel, Daniel was known to staff members there as a friendly and outgoing business guest. In fact, had anyone from MPD bothered to inquire on the evening of January 18th of anyone affiliated with La Quinta who had interacted with Daniel about his character or personality, they would have heard very positive things about how friendly and open he was to staff and how they liked and felt comfortable around him. On information and belief, none of the MPD officials who visited the La Quinta hotel immediately before Daniel's killing by Defendant Brailsford made any such inquiry of hotel staff.  Failure to make such an inquiry violated the applicable standard of care for a police response, was negligent, and contributed to the unlawful killing of Daniel.

31.     The two pellet rifles Daniel traveled with for work were company property and, due to their expense, Daniel preferred to keep them in his room where they would be safe from anyone burglarizing cars in the hotel parking lot.  Daniel's regular practice was to advise hotel staff that he had the pellet rifles with him and intended to keep them in his room.

32.     On the evening of January 18, 2016, Daniel had his two work pellet rifles in his room at La Quinta.  However, Daniel used the rifles for work and posed no threat to use the rifles to do harm to anyone else.

33.     On January 17, 2016, Daniel Shaver had socialized with members of the staff of the La Quinta hotel.  Staff members at the La Quinta came to know Daniel as a positive, friendly, outgoing guest who easily made new friends.   Again, had anyone from the MPD

inquired of La Quinta hotel staff on January 18, 2016 about the staff's interactions with Daniel they would have learned favorable information confirming Daniel's friendly, non-threatening nature. On information and belief, nobody from MPD made any such inquiries. Failure to make such an inquiry violated the applicable standard of care for a police response, was negligent, and contributed to the unlawful killing of Daniel.

34.     On January 18, 2016, Laney and Daniel spoke numerous times by phone, including about Laney's health and their two girls. At about 8:20 p.m. on January 18, 2016, Daniel called Laney and the two spoke again. Their conversation at about 8:20 p.m. was similar to all the other conversations they had had while Daniel was in Arizona.

35.     That same evening, Daniel Shaver had visited with the on-duty La Quinta hotel front desk employees who saw him order some food from Venezia's, a local pizzeria. The hotel staff understood, then, that Daniel was once again acting friendly and positively and ordering a dinner. They had no reason to think Daniel posed a threat to anyone else; rather, they had every reason to believe that Daniel was just going back upstairs to wait for his food and enjoy a meal. Had the MPD officers arriving at the La Quinta hotel immediately before Daniel's killing inquired properly of hotel staff on January 18, 2016 about Daniel and the staff's interactions with him they would have learned that Daniel had just recently been speaking with staff in the lobby and had just recently ordered himself a dinner to take in his room. On information and belief, nobody from MPD made any such inquiries.

36.     On information and belief, after he returned from ordering food Daniel met two other registered La Quinta guests – Monique Portillo and Luis Nunez – and they joined Daniel in his room to socialize. The three struck up a conversation.

37.     Sometime after Mr. Portillo and Ms. Nunez entered Daniel's room at the La Quinta hotel, a member of the La Quinta hotel staff placed a call to the local 911 emergency system and reported that someone had reported seeing an individual pointing a gun out of a window at the hotel. The caller could not identify where the gun was being pointed, did not report that the gun had been pointed at a person, or any particular target, and did not specify if

1   the hotel staff had received a report of a gun protruding out of a window or just someone
2   inside holding a gun that was pointing in the direction of the window.

3   38.   The hotel staff did not treat the report they received as an active shooter
4   situation. Instead, Ms. Leticia Jimenez, one of the hotel front desk employees, headed outside
5   to confirm what room was involved.

6   39.   Recognizing the room involved in the report as Mr. Shaver's room, and having
7   seen him earlier that evening ordering food, and having seen the Venezia's delivery person
8   heading upstairs, Ms. Jimenez, apparently with hotel management's approval, went up to
9   Daniel's room.

10   40.   On information and belief, Ms. Jimenez was unarmed and unafraid that Daniel
11   posed any serious threat to her or others. Her statement to the police after the shooting
12   indicated what she observed when she reached Daniel's room, the door was open, not closed.
13   The MPD officers who responded to the 911 call and went to Daniel's room, including
14   Defendants Brailsford, Langley, Doane, Elmore, Cochran and Gomez could have and should
15   have obtained that same information from Ms. Jimenez before they proceeded to Daniel
16   Shaver's room.

17   41.   Ms. Jimenez could see the people inside Daniel's room through the open door
18   and saw a large Hispanic mail with black hair, facial hair, and a black jacket with what
19   appeared to be a rifle in his hands. That description could not possibly have been confused
20   with Daniel who was not Hispanic and was wearing just basketball shorts over underwear and
21   a t-shirt when he appeared just a short time later in the hotel hallway at the MPD officers'
22   request. Ms. Jimenez recognized it was someone other than Daniel who was holding the
23   object she identified as a rifle.

24   42.   Ms. Jimenez actually spoke to Daniel at his room and noted that she thought she
25   may have been observing the sale of a rifle.

26   43.   At around 9:15 p.m. on January 18, 2016, multiple MPD officers including
27   Defendants Brailsford, Langley, Doane, Elmore, Cochran and Gomez arrived at the La Quinta

28

1    hotel in response to the 911 call. Defendant Langley was the senior responding officer and

2    took command of the other officers who arrived at the scene.

3        44.    Defendant Langley coordinated an immediate action team of officers including

4    Defendants Brailsford, Elmore, Doane, Cochran and Gomez to go and secure room #502 –

5    Daniel Shaver's room.  Those officers ultimately moved to the fifth floor of the La Quinta

6    hotel and took positions outside room #502 under Defendant Langley's command.

7        45.    At the time he arrived at the La Quinta hotel, Defendant Brailsford was a lightly

8    experienced officer whose prior conduct and actions indicated a dangerous immaturity, an

9    unwillingness or inability to exercise personal restraint, and a willingness to employ

10   inappropriate, unwarranted and excessive levels of force and violence in his activities while on

11   duty.

12       46.    On information and belief, Defendant Brailsford had been involved in an

13   excessive use of force in connection with an incident at a convenience store that was well

14   known to MPD officials and gave them reason to question his fitness for duty, to know of his

15   predilection for employing excessive degrees of violence and force, and to be on notice of his

16   corresponding danger to the public.

17       47.    More specifically, in a video captured on or about September 27, 2015 (several

18   months before the shooting of Daniel Shaver) a member of the public appears to be subjected

19   to an excessive and unjustified use of force by Brailsford. A copy of that video can be viewed

20   at https://www.youtube.com/watch?v=1HEZm5em3dY.  MPD was well aware of that incident

21   because it resulted in a citizen complaint, investigated internally under IA No. 2015-238.

22       48.    The failure of the City of Mesa and MPD to suspend, terminate or retrain and

23   properly supervise Brailsford after this earlier incident meant that the City of Mesa and MPD

24   wrongfully exposed Daniel and the Victims to a known threat and unreasonable risk of danger

25   posed by Brailsford's uncontrolled temper and willingness to exceed appropriate use of force

26   boundaries irrespective of his training and MPD policies.

27       49.    On the night of January 18, 2016, Defendant Brailsford was carrying an AR-15

28   weapon as his duty weapon. On that rifle he had installed a customized dust cover bearing the

interior inscription "You're Fucked" and bearing an exterior inscription bearing a Spartan helmet and the phrase "molon labe." On information and belief, Defendant Brailsford's use of the customized dust cover violated MPD policy and reflected Brailsford's disregard for authority and governing police policy as well as a level of personal immaturity inconsistent with the responsibilities of sworn peace officer.

50.    "Molon labe" is a classical Greek term translating as "come and take them", taken from a Greek tale stating the defiance of King Leonidas to lay down his weapons and surrender to an invading enemy.

51.    On information and belief, Defendant Brailsford's use of the customized dust cover and also reflected his disrespect for the rights and interests of the public he was sworn to serve and a dangerous predilection for excessive force and violence that the MPD negligently and recklessly failed to identify and address.

52.    Thus, based on the foregoing, MPD had sufficient information that Defendant Brailsford represented a threat and danger to members of the community, like Daniel Shaver and the Plaintiffs, on the night of January 18, 2016. Yet, MPD failed to take the supervisory and protective actions necessary to eliminate that threat and protect Daniel Shaver and the Plaintiffs from Defendant Brailsford.

53.    The City of Mesa's failure to safeguard Daniel and the Plaintiffs from Brailsford knowing his proclivities and excesses constitutes grossly negligent, reckless and intentional wrongful conduct rendering MPD and the City of Mesa liable to the Plaintiffs for all harms arising out of Daniel Shaver's killing.

54.    In the event that MPD claims not to have known about the dust cover, or about Defendant Brailsford's prior use of excessive force, or to the extent that MPD officials had overlooked or missed such signs of Brailsford's dangerous character, personality and actions, then the City of Mesa, acting through MPD and its agents, failed in its duty to properly screen MPD officers for such issues and to protect Daniel Shaver, the Plaintiffs, and others by not hiring persons with the traits and predilections of Defendant Brailsford. Also, in that event,

Defendant City of Mesa failed in its duty to the Plaintiffs and Daniel Shaver to properly inspect, oversee, supervise, train and control Defendant Brailsford,

55.     The facts further indicate that MPD had failed in its duty to Daniel Shaver and the Plaintiffs to have adequately and appropriately trained and supervised Defendant Brailsford prior to and on January 18, 2016, so that he would honor and demonstrate appropriate self-restraint, de-escalation techniques, and respect for the public and the policies of the MPD. The facts also indicate that MPD had failed in its duty to adequately and appropriately train and supervise Brailsford so that he would not employ excessive or inappropriate levels or types of force, as he did against Daniel Shaver.

56.     On information and belief, the La Quinta employees who decided to call 911 or directed the call to 911 had access to greater information than they relayed to the 911 operator about the circumstances occurring in Daniel's hotel room. Also, on information and belief, had those employees provided to either the 911 operator or the MPD officers responding to the 911 call the additional information they knew about Daniel, including his general demeanor, his positive interactions with staff a day earlier and on the 18th, and his having just recently ordered food, they would have provided material information that would have materially reduced the responding MPD police officers' alleged perception of what risks of harm existed at the hotel that night.   It was negligent and reckless for the La Quinta hotel staff to advise the 911 operator and the responding MPD officers in the way they did, omitting material information the La Quinta staff knew about the occupant of the room where a rifle was supposedly spotted.

57.     The window screen on Daniel's hotel room at the La Quinta hotel on January 18, 2016, was secured.   It could not easily be removed or moved aside by a hotel guest. Therefore, there is no possibility that anyone had actually extended a rifle outside the window prior to the 911 call that brought MPD officers to Daniel's room.

58.     On information and belief, the La Quinta hotel staff on duty on January 18, 2016, knew of the fixed condition of the window screen on Daniel's room. They could have easily informed the MPD of that fact when MPD officers arrived at the hotel that evening in response

to the 911 call.  On information and belief, however, they did not do so, and the MPD officers never asked any La Quinta staff before Defendant Brailsford shot and killed Daniel what the condition or status of his window or window screen were.

59.     The failure of the La Quinta hotel staff to recognize that any report of a rifle extending out of the window of Daniel Shaver's room was not credible because the window screen was fixed over the opening, and to report that fact to the 911 operator and the responding MPD officials, was part of the reckless and negligent actions of the La Quinta staff that contributed to the false perceptions and assumptions of the MPD officers that Daniel Shaver presented a threat of deadly force.

60.     On information and belief, the MPD officers who responded to the 911 call, including Defendants Langley, Brailsford, Doane, Cochran, Elmore and Gomez, could have easily confirmed the fixed condition of the screen on Daniel's hotel room and concluded that the report of a rifle pointed out of a window could not have been true by simply observing the window from outside, especially with a flashlight and/or binoculars or rifle scopes, which should have been standard equipment for officers on evening patrol duty. On information and belief, no one from MPD directed that the room window conditions be checked or asked about them to test the veracity of the information in the 911 call. That constitutes culpable negligence, violates the applicable standard of care and was reckless and/or negligent, and contributed to the wrongful killing of Daniel Shaver.

61.     The MPD officers who went to Daniel's room failed to conduct an adequate and appropriate inquiry into the facts confronting them, and on information and belief did not even conduct the rudimentary steps of speaking to the persons who supposedly saw a rifle through a hotel window or of speaking to hotel staff members like Ms. Jimenez to learn the critical information known to them about Daniel and the situation in Daniel's room that would have confirmed that Daniel posed no threat to anyone, including the MPD officers.

62.     Had any of the MPD officers who responded to the 911 call before Daniel's killing properly investigated the situation at the hotel, they would have learned through just a short conversation with Ms. Jimenez and the rest of the on-duty staff at the hotel all the

positive and non-threatening things Ms. Jimenez and the others at La Quinta knew about Daniel Shaver, including those facts about his demeanor, interactions with others, and his recent ordering of dinner.

63.     The MPD officers also would have learned through an appropriate inquiry of hotel staff that Ms. Jimenez had actually felt comfortable enough to go up to Daniel's room unescorted and unarmed shortly before their arrival.

64.     The MPD officers also would have learned through an appropriate inquiry of hotel employee Ms. Jimenez that the rifle in the room was being handled by a large Hispanic male with facial hair wearing a black jacket, not Daniel, that the room door had been open when Ms. Jimenez arrived there just a short time ago, and that she thought she might have been observing a sale, not threatening activity.

65.     The failure of the responding MPD officers to obtain the important information Ms. Jimenez and other staff or witnesses at the La Quinta hotel knew was a violation of the applicable standard of care for police work, was reckless and put people's lives, including Mr. Shaver's, in needless danger. It allowed the MPD officers to reinforce their preconceived, but factually ignorant beliefs that they were somehow walking into an active shooter-type scenario, when the hotel staff could have confirmed easily that the situation was nothing of the sort. This reckless and negligent failure to investigate contributed to the wrongful killing of Daniel Shaver by Defendant Brailsford.

66.     It was also reckless and negligent and subjected Daniel Shaver to the threat of harm that ultimately caused his death for the La Quinta staff to not affirmatively advise the MPD officers responding to the 911 about all they knew about Daniel Shaver and what Ms. Jimenez had seen in his room shortly before the police surrounded the room.

67.     Sometime after Ms. Jimenez left Daniel's room, Mr. Nunez excused himself and left the room. On information and belief, Daniel and Ms. Portillo continued speaking, with Daniel sharing information about his family. Neither of them were engaged in any activity creating a threat of harm to others.

68.     As the senior responding officer, Defendant Langley was responsible for tactical decisions of the MPD officers under his command and for properly supervising the actions and appropriately restraining the use of force of those on his team.  Defendant Langley was responsible through his actions and failures to act, including those listed above, for decisions and actions that resulted in him and his team members making false and dangerous assumptions, employing inappropriate and excessively aggressive and violent tactics, and inappropriately escalating the situation outside Daniel Shaver's room.

69.     By his actions and his failures to act appropriately and in accordance with the appropriate standards of care for a police officer in his situation, Defendant Langley encouraged overly aggressive and inappropriately violent actions by those under his command including Defendant Brailsford, and encouraged the inappropriate, unlawful and excessive use of force by Brailsford that caused Daniel Shaver's death.  Defendant Langley therefore facilitated, encouraged, motivated and caused Daniel Shaver's death.

70.     First, the MPD officers who went to Daniel's room had no reports that a single shot had been fired or that there was any sort of "active shooter" situation involved.

71.     The MPD officers who went to Daniel's room had no reports that anyone in Daniel's room had aimed or pointed a rifle at any person.

72.     The MPD officers who went to Daniel's room knew that a material amount of time had passed since the report of someone seeing a rifle with no shots fired at all, and no one threatened.

73.     The MPD officers who went to Daniel's room had not received any reports of anything else unusual or untoward happening, like loud noises, or screams or shouts coming from Room 502.  All was in fact quiet at the hotel, which logically indicated that the rifle seen in Room 502 may not reflect an imminent threat.

74.     Those same MPD officers had no personal description of the person who supposedly was holding the rifle.

75.     The MPD officers who went to Daniel's room did know, or should have known, that the 911 call they were responding to was not reporting information or details the caller

had seen, but just represented a second-hand report of what the caller had been told by someone else. The MPD officers therefore did not know if the person originally reporting the issue had supposedly seen a weapon actually extended outside a window, or just a person holding the weapon inside the building.

76. Defendant Langley recognized that having just three officers with him was sufficient to address the situation involving Room 502, as he ultimately sent two officers back to the lobby to collect a room key and to call Room 502.

77. Defendant Langley could therefore have asked some of his team members to conduct the follow-up inquiries mentioned above while the remaining officers surrounded the room, or he could have directed MPD officers remaining downstairs to ask the next arriving officers to conduct that investigation for him and radio the results.

78. Obtaining the appropriate background was a safer practice for both those in Daniel's room and those persons in all surrounding areas of the hotel than the MPD officers rushing off heavily armed and assuming that heavy firepower might need to soon be deployed in the middle of an occupied hotel's hallway. Defendant Langley and the other officers going to Daniel's room with him therefore elected to employ tactics that unreasonably put lives at risk.

79. Defendant Langley elected to deploy his forces as if an imminent threat of an active shooter threatening all hotel guests existed, though he had no evidence of that, and the little information he had suggested exactly the opposite. On information and belief, Defendants Brailsford, Elmore, Doane, Cochran and Gomez agreed with and complied voluntarily with the tactics selected by Defendant Langley, though they also had no knowledge of facts justifying their tactics.

80. Defendants Langley, Brailsford, Elmore, Doane, Cochran and Gomez failed to consider the possibility that there were a myriad of explanations for a hotel guest having a rifle in their room that were innocent and involved no criminal or threatening activity. The failure to consider these possibilities was a contributing cause of the wrongful killing of Daniel Shaver.

81.     The rash, irresponsible and dangerous mindset Defendants Langley, Brailsford and the other MPD officers appearing with them outside Daniel's hotel room had already adopted before they ever saw Daniel Shaver is evidenced by the reckless attitude they displayed toward other hotel guests endangered by their actions.

82.     Defendant Langley's entire team outside Room 502 knew that Langley and officers Brailsford and Elmore were armed with AR-15 rifles, and that officers Doan, Cochran and Gomez also had deadly firearms on them.

83.     Sergeant Langley and the other officers understood well that the penetrating force of an AR-15 round or even the rounds from their sidearms was sufficient to pass through surrounding construction materials, and that discharging their weapons in the hallway of the La Quinta threatened to send bullets, bullet fragments or other dangerous shrapnel or debris into surrounding rooms in a manner that could severely injure or kill other guests.

84.     The MPD officers did not seek to clear rooms around, above and below the targeted room 502 so that there would be less risk to other guests.  Rather, with no reliable or corroborating evidence justifying their conclusions, and no adequate attempts to obtain the same, the MPD officers making up Defendant Langley's team made wild assumptions that Room 502 contained an individual so threatening to the rest of the hotel and the officers that they could not even risk clearing other rooms first before launching their assault against Room 502.  After Daniel was killed, the MPD officers had to clear at least one nearby room to ensure that no guests within had been hurt.

85.     As the MPD officers comprising Langley's team arrived near Room 502, Defendant Langley announced his plan to get Daniel Shaver and Monique Portillo out of the room, bring them to about six feet in front of the officers and "put them out."

86.     Before the MPD officers outside Room 502 made direct contact with Daniel, they heard both a male voice and a female voice coming from the room. On information and belief, they heard voices speaking in a conversational tone, not anything that indicated any threatening behavior or conditions.

87.     After an MPD officer telephoned into Room 502, Daniel and Ms. Portillo voluntarily exited in compliance with the MPD officers' request.  They did not hesitate or delay or express any resistance or reluctance to comply.

88.     Yet, Defendant Langley set a harsh and directly threatening tone with Daniel and Ms. Portillo once they began to exit the room.  From that time until Daniel was shot and killed by Defendant Brailsford, Defendant Langley engaged in a series of aggressive, threatening and confusing orders that heightened the aggressiveness of those officers with him and improperly increased their expectation that they had something to fear from Daniel, should be prepared to shoot him at the slightest movement, and were authorized and encouraged to do so by their commanding sergeant.

89.     Investigating Detective Sipe of the MPD has viewed the AXON body camera evidence captured of the killing of Daniel Shaver by the cameras worn by Defendants Brailsford and Doane.  Detective Sipe has explained that "[a]t approximately twelve minutes and fifty-three seconds of the video" Daniel came out of his hotel room and "was already on his hands and knees" when Sgt. Langley shouted for both Daniel and Ms. Portillo to get on the ground. Daniel was obviously compliant and offered no resistance.

90.     Daniel Shaver was dressed in just underwear, loose athletic shorts and a t-shirt. He was not wearing clothing in which he could conceal a rifle, and none of the MPD officers saw anything on Daniel's body or formed by his clothes that suggested he had any weaponry of any kind on his person.

91.     Nothing about Ms. Portillo suggested she had any sort of weaponry on her, and indeed both Mr. Shaver and Ms. Portillo were completely unarmed as they interacted with the MPD officers in the hallway at the La Quinta hotel.

92.     Yet, as Daniel and Ms. Portillo exited the hotel room and entered the hallway surrounded by the multiple MPD officers Defendant Langley stated, 'Alright, if you make a mistake another mistake, there's a very severe possibility you're both going to get shot'.  He said this despite the fact that both individuals had complied with his direct instructions up until that point.

93.     Daniel was obviously traumatized, frightened and submissive.   The MPD officers outside his room could see this in his physical posture and movements and could hear it in his voice when he tried to speak to them.   Yet, when Daniel attempted to speak, Sergeant Langley said, "This is – shut up. I'm not here to be tactful and diplomatic with you. You listen, you obey. For one thing, did I tell you to move young man?" To which Daniel responded, "No, sir. No, sir. No, sir. No, sir."

94.     As Defendant Langley continued to issue him orders, Daniel appeared both compliant and confused to all the MPD officers who could see him in the hallway. At one point, Defendant Langley ordered Daniel to place his hands on the back of his head and interlace his fingers. Daniel was again compliant.

95.     Defendant Langley then told Daniel to cross his left foot over his right foot. Daniel complied with this but appeared to be confused as to which foot Defendant Langley had ordered him to cross. He crossed his feet both ways before finally crossing his feet as Defendant Langley had instructed. Daniel's actions showed he was concentrating on behaving just as the MPD officials wanted.

96.     Defendant Langley then told Daniel, "if you move, we're going to consider that a threat and we are going to deal with it and you may not survive it." This was the second threat against Daniel's life in a matter of minutes despite Daniel's repeated and unabated attempts to comply with the police instructions.

97.     After the MPD officers took Monique Portillo into custody, Langley again told Daniel "to listen to his instructions and 'do not make a mistake.'" Nowhere in MPD's or the City of Mesa's policies, or the law governing use of force by police officials, is the use of deadly force ever justified because a suspect "made a mistake."   Yet, Defendant Langley expressed his clear belief and directives to his subordinate officers that they could and should shoot Daniel if he simply made a mistake.

98.     Defendant Langley continued to confusingly instruct Daniel to make various bodily movements, such as requesting that Daniel push himself up to a kneeling position while also keeping his legs crossed. When Daniel accidentally uncrossed his legs while moving to a

kneeling position, Sergeant Langley immediately shouted at Daniel to keep his legs crossed, to which Daniel crossed his legs, and said, "I'm sorry. I'm sorry. I just pushed my --." Defendant Langley did not let Daniel complete his sentence.

99.    Daniel then apparently put his hands behind his back as if waiting to be handcuffed, about which investigating Detective Sipe of the MPD has noted, "This did not appear to be an exaggerated movement and looked similar from the vantage point of the video as when someone is handcuffed with officers behind them."

100.    However, Defendant Langley started screaming about Daniel's hands, even though his initial commands of Daniel should do with his hands was loud and indiscernible.

101.    Defendant Langley shouted for Daniel to place his hands in the air and Daniel "complied and rapidly put his hands above his head." Then Daniel said, "No, please do not shoot me. I'm … I'm trying to just do what you –"in a voice that, according to Detective Sipe, "appeared to be panicked."

102.    At that point, the MPD officers near Daniel in the hallway, including without limitation Defendant Brailsford, could hear Daniel audibly sobbing including when he said "yes sir", in response to Defendant Langley's question about whether he understood what he was being told to do.

103.    Defendant Langley then shouted at Daniel to crawl towards him. Again displaying his prompt and respectful compliance with the police commands, Daniel dropped to his hands and knees and could audibly be heard sobbing and stating 'Yes, sir' by the MPD officers as he began to crawl forward.

104.    The MPD officers had already taken Monique Portillo into custody. Defendant Langley commanded Monique Portillo to crawl toward them, and then had Defendant Gomez walk forward to take her into their custody when she "was approximately no more than 6 feet in front of us," per Defendant Langley.

105.    When the MPD officers had taken her into custody, they left her purse on the floor of the hallway in the direct path that Defendant Langley was ordering Daniel to crawl on. In fact, when Defendant Brailsford shot Daniel, Daniel collapsed on the purse.

106.   Leaving the purse in the hallway was reckless and negligent, inappropriate, and violated the standard of care for police work.  It placed Daniel at the risk of imminent death by shooting to leave the purse in the hallway and make him crawl towards and over it. This was especially so given the threats and instruction vocalized by Defendant Langley to his team members that if Daniel moved it was to be taken as a threat and Daniel might not survive.  On information and belief, it was inevitable and imminently foreseeable that someone having to crawl over or around a purse obstructing their path would make movements of their arms and/or legs, and that, given Defendant Langley's admonitions, one or more of his officers might open fire and hurt or kill the individual without justification.

107.   The fact that the MPD officers forced Daniel to crawl in a manner and in clothing that forced his shorts down in an embarrassing fashion, all the while intending to shoot him if he moved his hand back to prevent the shorts from falling was also grossly and intentionally reckless, dangerous and falls far below any applicable standard of care.

108.   The fact that Defendant Brailsford shot Daniel and killed him exhibits intentional, criminal conduct falling far below any standard of care applicable to Brailsford and all those MPD officers acting in concert with him.

109.   The willingness and intent of Defendant Langley to promote, direct and encourage the type of irresponsible, inadequate, reckless and aggressive tactics described above was a contributing cause of dangerous emotions of fear, anxiety and aggression among those he led, and encouraged Defendant Brailsford to shoot Daniel Shaver. This was reckless and disregarded appropriate standards of police leadership and conduct, endangering immediately both the occupants of Room 502 and of all surrounding rooms and constituting a contributing cause to the wrongful killing of Daniel Shaver.

110.   At the time Daniel was crawling in the hotel hallway, his athletic shorts had fallen considerably down his rear end, exposing significantly his underwear.  This would have provided further confirmation to Defendant Brailsford and the other officers assembled there that Daniel had no weapon hidden on him, especially not in the waistband of his shorts.  There

1   was no reason for the Defendant MPD officers to believe that Daniel was carrying a weapon of

2   any kind – whether a rifle as described in the 911 call or something else.

3       111.   On information and belief, Daniel made no moves and took no actions of any

4   kind that indicated a threat justifying the use of deadly force against him.  In fact, the last

5   words Daniel said was the submissive phrase: "Yes, sir. Please".  But then, Officer Brailsford

6   killed him with five rounds fired from his AR-15 weapon.

7       112.   According to Defendant Langley, when Defendant Brailsford killed Daniel and

8   Defendant Langley was still berating and threatening Daniel, Daniel was located "no more

9   than 6 feet in front of us" per Defendant Langley, the same location at which Defendants felt

10  comfortable to simply walk forward and take custody of Monique Portillo.

11      113.   No other officer present fired their weapon. Defendant Elmore carried an AR-15

12  and did not fire. Defendant Langley carried an AR-15 which was not fired. Defendant Doane,

13  armed with a less lethal taser, did not fire. And, Defendants Cochran and Gomez also did not

14  fire a weapon.  There was no reason for anyone to fire.  Daniel did nothing to warrant being

15  shot.

16      114.   Daniel's killing was therefore unprovoked, unwarranted, unjustified, callous,

17  depraved, vicious and evil. It reflected a conscious decision by Defendant Brailsford to shoot

18  an unarmed and innocent man who was complying with police orders, sobbing, and begging

19  not to be shot.

20      115.   The decisions made and tactics employed by Defendants Langley, Brailsford,

21  Elmore, Doane, Cochran and Gomez display and stem from a lack of adequate training, a lack

22  of adequate screening and a lack of adequate supervision, as well as personal inclinations

23  created by dangerous and unsuitable predispositions, and inadequate and improper policies,

24  procedures and practices that encouraged an overly-aggressive, unjustifiably hyper-vigilant

25  state and a predilection for violent confrontation that posed substantial and unwarranted

26  dangers to those interacting with these officers, including Daniel Shaver.

27      116.   The actions and failures to act of Defendants comprising Defendant Langley's

28  team, including the decisions and directions provided by Defendant Langley, and the voluntary

compliance with such decisions and directions by Defendants Brailsford, Doane, Elmore, Cochran and Gomez, reflects inadequate or irresponsible and inappropriate police training and practices by the MPD and the City of Mesa, as well as highly inappropriate personal dispositions for responsible police work among all the Defendants named in this paragraph. They each, individually and collectively, in cooperation with and support of one another, employed tactics that allowed matters to escalate into an excessive and unreasonably dangerous deployment of force without heed of the actual facts indicating there was no need or justification for such force.

117.    Daniel Shaver's death, therefore, could also have been avoided through proper selection and hiring of MPD officers, and by proper training and supervision of Brailsford, Langley and the other MPD officers on scene at Daniel's killing.

118.    The City of Mesa failed to properly select and hire officers for the MPD and therefore it allowed Daniel Shaver to be confronted on the evening of January 18, 2016, by individual officers either inappropriately disinclined or unable to follow appropriate limitations on police use of force, or unable to absorb and implement training on appropriate practices for investigation of the total situational circumstances facing an officer or team of officers at a response scene, appropriate and proportional employment of force, and de-escalation techniques.

119.    The City of Mesa, through its MPD and the MPD officials, failed to properly train, screen, supervise and direct each of the Defendants comprising Langley's team (Langley, Brailsford, Doane, Cochran and Gomez). The reckless and indifferent actions of such officers display a conscious disregard by the MPD for appropriate screening, hiring, training, supervision and interventions needed to ensure compliance with applicable and accepted use of force standards, investigatory standards and tactical response standards.

120.    Had they done so, Daniel Shaver would not have been killed and the remaining damages for which relief is sought here would not have occurred.

121.    On information and belief, had the members of Defendant Langley's team been properly trained, screened, supervised, and directed, the Defendants on the Langley team

would have employed measures or actions that completed appropriate investigations before assessing final approach tactics, would have employed de-escalation tactics, and would not have engaged in the aggressive, confusing and irresponsible instructions Defendant Langley insisted on.  In short, Daniel would not have been killed.

122.   Each of the Defendants comprising Defendant Langley's team also bears their own individual responsibility and liability for not overcoming the poor training and practices that encouraged them to not question or investigate what was really happening in Room 502, and for not challenging the inappropriate and dangerous tactics employed at Defendant Langley's direction as discussed above.

123.   The actions and failures to act of the City of Mesa, through its individual agents and through its MPD, as alleged above, violated the standard of care applicable to the City of Mesa, were evil and malicious, or, at a minimum, reckless and/or negligent, and were a contributing cause of Daniel Shaver's wrongful killing.

124.   The actions and failures to act of the Defendants Brailsford, Langley, Elmore, Doane, Cochran and Gomez, as alleged above, violated the standard of care applicable to their positions as police agents of the City of Mesa, were evil and malicious, or, at a minimum, reckless and/or negligent, and were a contributing cause of Daniel Shaver's wrongful killing.

125.   The actions of the Defendants deprived Daniel Shaver of his life without due process of law in violation of his rights under the United States and Arizona constitutions, and similarly deprived Plaintiffs Laney Sweet and her and Mr. Shaver's children of rights secured by the United States and Arizona constitutions without due process of law.

126.   By taking Daniel Shaver's life, the Defendants not only robbed him of his future, but they caused his family to lose the love, companionship, support, friendship, and economic support of their husband and father.  The Defendants' actions, as described above, have directly, proximately and permanently devastated Plaintiffs Laney Sweet and her minor children emotionally and psychologically.

127.   The Plaintiffs have suffered egregious and permanent harm and loss in multiple forms, including both non-economic pain and suffering, costs, expenses and economic losses

caused by the post-death expenses and negative impacts on Laney Sweet's ability to earn an income, particularly given her new status as a single parent.  The Plaintiffs have also suffered long-term and permanent economic losses by virtue of losing Daniel's ability to earn income, provide benefits, and provide savings and investment value and income for the family. The Plaintiffs are entitled to full compensation for all their losses.

128.   Each of the MPD officers at the scene of Daniel's killing, including Defendants Brailsford, Langley, Doane, Elmore, Cochran and Gomez are jointly and severally liable, along with the City of Mesa, for Daniel's death and all the harms inflicted on him and Plaintiffs Laney Sweet and her minor children.  Each of them had an independent duty to ensure that they behaved rationally, carefully, and investigated all the relevant facts before putting themselves, as a team, in a situation where Daniel's life became endangered.

129.   By following the sub-standard leadership and inappropriate directives of Defendant Langley, the other officers knowingly and intentionally placed Daniel and others in harm's way and at an unreasonable risk of death.  By cooperating with and facilitating Defendant Langley's lack of investigation, belligerent and bullying and confusing tactics, and gross disregard for the true circumstances his team faced, each of the MPD officers named as Defendants herein aided, abetted, conspired with and facilitated the killing of Daniel Shaver.

130.   By allowing officer Brailsford to operate with an AR-15 personally modified to express disregard and even disgust for the public he encountered, the other officers who were aware of those circumstances allowed a dangerous and deadly instrument to be placed in the hands and discretion of an unsuitable personality.  The MPD officers are not entitled to a "Nuremburg defense" – claiming they were just following orders.  They each owed an individual duty of care to Daniel and the Victims and breached that duty in multiple ways by failing to stop the missteps and errors outlined above that lead to Daniel's death.

131.   Immediately after he shot Daniel Shaver, Defendant Brailsford was told to leave the area by Defendant Langley.  He turned off his AXON body camera.

132.   MPD policy prohibits an officer involved in a shooting to confer with other officers involved in the shooting or any family member other than a spouse until after an

investigation has been conducted. On information and belief, all the individual Defendants named in this action knew that policy. MPD's DPM 2.1.10 (Use of Force) mandates that the "supervisor shall immediately separate the involved members and/or witnesses and order them **not** to discuss the investigation, including the interview, with any unauthorized person. Authorized persons include: Homicide Unit investigators, involved members attorneys and/or Department representative, spouse, health care provider, and clergy." (Emphasis in original).

133.    Yet, in violation of that policy an MPD officer encouraged Defendant Doane to go to Defendant Brailsford in the parking lot outside the hotel shortly after the shooting. Defendant Doane turned off his AXON body camera before it could record anything he might have said to Brailsford, or that Brailsford said to him.

134.    While the investigation into Daniel Shaver's killing started, Defendant Brailsford, along with other officers who had been with him at the scene of the killing, were taken to an off-site location, apparently for some two to three hours before MPD Detective Sipe was able to interview Officer Brailsford and others about the incident.

135.    To the extent that any of the Individual Defendants were allowed prior to their interview for the formal investigation into Daniel Shaver's killing to communicate with one another, either directly or indirectly through proxies such as union representatives, counsel or other MPD officers, such communication was a knowing violation of the MPD policies.

136.    To the extent that Defendant Brailsford or any other named Defendant was allowed to communicate with a family member other than a spouse before they completed their interviews for the formal MPD investigation into the killing, such communication was a knowing violation of MPD policy.

137.    Defendants Langley, Brailsford, Doane, Elmore, Cochran and Gomez were required to, and did, complete written incident reports about the shooting of Daniel Shaver. Not coincidentally, incident reports written by the MPD agents who had been part of Langley's team fail to adequately convey Daniel's plea to the MPD officers not to shoot him, his audibly crying out of fear of what would happen, the confusing and belligerent nature of the instructions offered by Langley, and Daniel's continued attempts to comply with Sergeant

Langley's changing orders despite his obvious inability to completely understand Sergeant Langley's instructions.

138.    In contrast, many of those same incident reports share references to a perceived threat, even though Daniel did nothing that would amount to a threat.  The similar omissions from the reports and attempts to portray Daniel as threatening and uncooperative suggest collusive attempts to cover up the true facts, impede the investigation into Daniel's killing, make the shooting appear justified, and to hinder the investigation, any prosecution and any administrative proceedings or civil actions that could implicate or expose any of the Defendants to sanction, prosecution, or civil liability.  As such, they represent obstruction and further violations of the Plaintiffs' rights to know the truth and to have police officers and city officials fully and truthfully participate in any investigation or other proceeding involving the killing.

139.    As a result of the Defendants' actions, Defendant Brailsford has been charged criminally in the death of Daniel Shaver and is awaiting trial.

140.    The City of Mesa terminated the employment of Defendant Brailsford.

141.    On information and belief, the City of Mesa had served Defendant Langley with a notice of an internal investigation regarding his official conduct as an MPD officer, and Defendant Langley elected to retire rather than face possible discipline and loss of retirement benefits.

**THE DEFENDANTS' ACTIONS AFTER DANIEL'S DEATH**

142.    For many hours Laney Sweet frantically worried why she was unable to get in contact with her husband and sought fruitlessly to find him. She checked and learned that he did not show up for work, which was unusual. She started calling hospitals and police stations searching for answers.

143.    Ms. Sweet called the MPD and was told nothing about her husband's killing; instead, her requests for information about Daniel were left unanswered by the agency whose officer had wrongfully killed her husband.

144.   Finally, Ms. Sweet called the county coroner's officer and learned that her husband was dead and the coroner had his body.

145.   The MPD's refusal to even attempt to contact Ms. Sweet directly and let her know their officer had killed her husband was callous, conscious and intentionally disregarded the obvious harm that was being caused to her and her children through panic and anxiety anyone would feel if their spouse or father was missing.  This violated Ms. Sweet's and her children's rights to know her husband's condition and location, and further exacerbated the emotional harms caused by the Defendants.

146.   In contrast, the MPD attempted to inform other members of the public of the incident just one day after it occurred.  Showing just how powerful the coordinated story of the involved officers was, and how willing MPD and the City of Mesa were to believe it without question, on January 19, 2016, the MPD issued a news release, informing the public that officers were giving commands to Daniel "but he was not fully complying." MPD's press release also stated, "[b]ased on the initial report of the suspect having a gun, not complying with commands and reaching behind his body, the officer felt threatened and discharged his weapon striking the suspect."

147.   Notably, the press release fails to disclose that Daniel did not have a weapon on him at the time of his death and was begging for his life and crying before he was shot.  It omits the fact that Daniel was complying and attempting to comply with multiple orders from Defendant Langley, that he was speaking politely and submissively to the officers, and that Defendant Langley had engaged in overly and inappropriately confusing and aggressive commands that escalated the situation improperly and encouraged the unlawful killing of Daniel Shaver.

148.   The MPD press release also did not disclose the inappropriate and grossly reckless failure of the MPD officers to conduct any reasonable investigation of circumstances before charging up to Daniel's room, nor the hostile, belligerent, bullying, unprofessional and dangerous attitudes and tactics employed by Defendant Langley and cooperated in and facilitated by his fellow officers.

149.   The MPD press release does not reveal that Daniel's shorts were falling down before and at the time Defendant Brailsford shot him, that an MPD detective had concluded that Daniel may have been moving to pull his pants up, and that Daniel was being forced to navigate over a purse at the time he was shot.

150.   MPD thus intentionally withheld material facts from the public, to mislead the public about the actions of its officers, and to falsely convince the public through misinformation that Daniel's killing was justified.  The willingness of the MPD to spread such misrepresentations knowing they would eventually be learned by and harm Daniel's next of kin was reckless, indifferent, and grossly negligent, and creates further liability for MPD and the City of Mesa and any individuals involved in crafting that press message for the harm caused thereby to the Plaintiffs.

151.   Then, on January 22, 2016, MPD issued a press release to the public at large. The press release included the statement that, "[i]nvestigators worked through the night attempting to identify the deceased and were able to locate his father in Tennessee early the next morning rendering the notifications." Thus, MPD has admitted that it had the ability to provide Ms. Sweet the information she was requesting about her husband's whereabouts and condition, though its employees failed to do so.

152.   The MPD press release of January 22nd also stated: "A key piece of evidence of this case is the on-body camera video which captured the incident." It then claimed: "The Mesa Police Department vows an unbiased, thorough, and transparent investigation.  We strongly believe our department must be held to the highest level of accountability while ethically carrying out our public safety duties. The Mesa Police Department values our community partnerships and works extremely hard in engaging the community to build public trust and transparency."

153.   The MPD and City of Mesa therefore acknowledged that the Axon video evidence from officers Brailsford and Doane was a critical piece of evidence, that the public, including Daniel Shaver's family, are entitled to transparency and accountability, and that the

Axon videos were a key piece of that accountability and transparency that are rightfully expected by the Victims and other members of the public.

154.   Yet, the City of Mesa refused to comply with Ms. Sweet's public records requests for the AXON videos and has facilitated the efforts of Defendant Brailsford and the Maricopa County Attorney's Office to keep the Plaintiffs from ever seeing the relevant portions of the videos in which the MPD officers' interactions with Daniel are recorded until after Defendant Brailsford has been sentenced in a parallel criminal proceeding against him for the murder of Daniel.  This has been done over the Plaintiffs' express objections.

155.   The Plaintiffs' lack of access to the AXON video evidence has violated their rights under state and federal law, including their rights under the Arizona public records laws and their rights to free speech under the United States and Arizona constitutions.  The City of Mesa's cooperation in and facilitation of these rights violations have harmed the Plaintiffs, including by denying them their rights under law and by imposing upon them emotional harm, distress, suffering, humiliation, and other forms of psychological suffering, as well as all economic and non-economic damages that emanate therefrom.

156.   The Plaintiffs' lack of access to the AXON video evidence has further violated the rights of Laney Sweet and her children as Arizona crime victims under the Arizona Constitution, the provisions of the Arizona Revised Statutes granting rights to crime victims, and the Arizona Rules of Criminal Procedure. It has therefore denied them due process. The City of Mesa's cooperation in and facilitation of these rights violations have harmed the Plaintiffs, including by denying them their rights under law and by imposing upon them emotional harm, distress, suffering, humiliation, and other forms of psychological suffering, as well as all economic and non-economic damages that emanate therefrom.

157.   The Plaintiffs' lack of access to the AXON video evidence, and its purposeful exclusion from the view of the public by or in coordination with the City of Mesa has further prejudiced the Plaintiffs and prevented them from countering a highly charged, inflammatory, and factually inaccurate statement made via a Facebook post by the Mesa Police Association post concerning Daniel Shaver's shooting. Though the Plaintiffs do not yet know precisely

who wrote and published this post, or what members of the MPD or City of Mesa may have further circulated the post or similar negative and inaccurate commentary about Daniel's killing, the Plaintiffs allege, on information and belief, that the Mesa Police Association is largely made up of members who are officers and agents of the City of Mesa and MPD.  To the extent the factually inaccurate statement about Daniel's killing was written, authorized, or supported by Mesa Police Association members who also were or are members of MPD or the City of Mesa the posting and/or commentary provides further evidence of an institutional protectionist among officials of the City of Mesa aimed at interfering with and dissuading full disclosure of the relevant facts in Daniel's killing and inhibiting appropriate prosecutorial, administrative or civil proceedings against the City of Mesa, MPD or their individual agents.  Such postings have further caused and/or exacerbated harms to the Plaintiffs, including imposing upon them emotional harm, distress, suffering, humiliation, and other forms of psychological suffering, as well as all economic and non-economic damages that emanate therefrom.

158.   The Plaintiffs' lack of access to the AXON video evidence has prejudiced them from identifying all claims and causes of action they have against the Defendants named in this action, or against other officials or agents of the MPD and City of Mesa who participated in, facilitated, encouraged, conspired in, aided, abetted, or failed to properly prevent, control, stop or mitigate the misconduct, recklessness, negligence, or intentional acts or failures to act of other MPD or City of Mesa agents who have harmed the Plaintiffs.  The Plaintiffs therefore preserve here the right to supplement, amend, or modify the allegations, causes of action and demands for relief plead herein, and the right to add additional parties as Defendants in this or other appropriate actions after the Plaintiffs have obtained access to the full AXON video evidence.

159.   On information and belief, the actions and failures to act of any officer, employee, official or agent of the MPD alleged herein were taken on behalf of, for the benefit of, and as agents of the City of Mesa.  Also on information and belief, such actions or failures to act occurred in the course and scope of such individual's authorized employment or agency

relationship with the City of Mesa. Also on information and belief, all such actions or failures to act were either authorized by the City of Mesa, were directed or caused by the City of Mesa, or were consistent with or performed pursuant to the City of Mesa's policies, practices and customs. Therefore, the City of Mesa is liable for all such actions or failures to act and for all harms, injuries or damages to the Plaintiffs that result or derive from the conduct, actions and omissions or failures to act of the individual Defendants or of any other officer, employee, official or agent of the MPD or the City of Mesa that is relevant to or implicated in the allegations above.

160.   In addition, as the master and principal to those officers, employees, officials, servants or agents whose actions and failures to act form the basis of the claims alleged herein, the City of Mesa is liable for the conduct of City of Mesa and MPD officers, employees, officials, agents or servants that were consistent or compliant with the City of Mesa's and the MPD's policies, practices, and customs that have engendered, including through police training, supervision and discipline, attitudes, intentions, any practices, conditions, or circumstances that promote, allow, encourage or fail to appropriately discourage or prevent the use of excessive force in police interactions with the public or potential suspects, and that have resulted in this case in the use of illegal, unlawful, excessive and unconstitutional force against Daniel Shaver and harm to him and the Plaintiffs.

161.   The actions and failures to act of the Defendants alleged herein were evil, malicious and undertaken with the intent to harm Daniel Shaver and his family or with reckless disregard of the substantial risk of harm to Daniel Shaver and his family. The facts exhibit that Defendants acted with an evil hand guided by an evil mind. The Plaintiffs' claims qualify, therefore, for the imposition of punitive or exemplary damages in an amount sufficient to punish the Defendants and to deter other similarly situated persons from like conduct.

## COUNT I
### (Wrongful Death – A.R.S. § 12-611, *et seq.* – Against the Mesa Defendants)
### (Laney Sweet, E.S., N.S. – Plaintiffs)

162.   The Plaintiffs reallege and incorporate as if set forth fully herein all the allegations from the paragraphs above.

163.   Through the actions and failures to act alleged above, Defendants City of Mesa, Brailsford, Langley, Doane, Elmore, Cochran and Gomez, as well as any other person or entity qualifying as a currently unidentified agent or servant of the City of Mesa engaging in the actions or failures to act from which the causes of actions alleged herein arise (hereafter, collectively, the "Mesa Defendants") facilitated, encouraged, used, and failed to prevent the use of excessive, unreasonable, and illegal force, resulting in Defendant Brailsford shooting and killing Daniel Shaver on January 18, 2016.

164.   The shooting and killing of Daniel Shaver constitutes a wrongful act, neglect or default for which the Mesa Defendants are jointly and severally liable.

165.   The Defendants owed duties of due care to Daniel Shaver and the Plaintiffs. Such duties included without limitation the duty to protect Daniel Shaver and the Plaintiffs from harm that might be caused by the use of unnecessary, unreasonable, or excessive force against Daniel Shaver.

166.   The Mesa Defendants' duties of care emanated from their role as a public police agency and its officers charged with preserving life and not employing unnecessary, unreasonable, or excessive force in the conduct of their official activities.   The Mesa Defendants therefore had a duty to protect Daniel Shaver from physical harm or death.

167.   The Mesa Defendants' duties of care included the duty not to hire or employ personnel as police officers whose character, demeanor, psychological makeup, behavior, predispositions or history of aggressive, abusive or inappropriate physical conduct makes them unfit for service as a police officer or a danger to members of the public with whom they may come in contact in the course of police duties.

168.   The City of Mesa's duties of care included the duty to ensure that all MPD officers were properly trained in how to respond to 911 calls, how to conduct appropriate initial inquiries and investigations to assess situations facing responding officers, how to contact, apprehend, or question individuals in a manner that does not involve overly aggressive tactics or that does not heighten feelings of anxiety or aggression among responding officers.

169.   Defendant Langley, as a supervising police official and the senior commanding officer at the site of Daniel Shaver's killing, also owed a duty to Daniel Shaver and the Plaintiffs to properly and proactively supervise those MPD officers under his authority so that they would appropriately respond to the 911 call on January 18, 2016 from the La Quinta hotel, so that they would conduct appropriate initial inquiries and investigations to assess situations facing responding officers, and so that they would not use excessive, unreasonable, unnecessary or inappropriate force when interacting with Daniel Shaver.

170.   On information and belief, Defendant Brailsford had a character, demeanor, psychological makeup, behavioral issues, predispositions, and a history of aggressive, abusive or inappropriate physical conduct prior to January 18, 2016 that made him unfit for service as a police officer and a danger to members of the public with whom he could come in contact in the course of his police duties. More specifically, Defendant Brailsford presented an unreasonable danger and risk of harm to Daniel Shaver and the Plaintiffs on January 18, 2016.

171.   Defendant City of Mesa had knowledge of the dangers posed by Defendant Brailsford and of his unfitness for duty on January 18, 2016, and had a duty to act to protect Daniel Shaver and Plaintiffs from that danger.

172.   The treatment of Daniel Shaver by the MPD officers, including the killing of Daniel Shaver, violated duties of care the Mesa Defendants had to Daniel Shaver and to the Plaintiffs, including without limitation their duties to create, enforce and train officers in implementing policies concerning appropriate tactics, techniques and use of force.

173.   The Mesa Defendants' treatment of Daniel Shaver also violated duties of care the Mesa Defendants had to Daniel Shaver and to the Plaintiffs to properly supervise the work of the MPD officers at the scene of Daniel's killing and to prevent them from using any inappropriate, unnecessary, unreasonable or excessive tactics or force.

174.   The Mesa Defendants' treatment of Daniel Shaver also violated duties of care the Mesa Defendants had to Daniel Shaver and to the Plaintiffs to properly investigate and assess the circumstances facing them at the La Quinta hotel, and to select and utilize tactics, techniques and force appropriate and proportionate to those circumstances.

175.   The Mesa Defendants' treatment of Daniel Shaver also violated duties of care the Mesa Defendants had to Daniel Shaver and to the Plaintiffs to avoid using any unnecessary, unreasonable or excessive tactics or force against Daniel Shaver, and their duty not to kill Mr. Shaver.

176.   Defendant City of Mesa breached its duties to Daniel Shaver and Plaintiffs by continuing to employ Defendant Brailsford and allow him to operate as an MPD officer capable of using lethal force in the course of his official duties on January 18, 2016.

177.   The Plaintiffs Laney Sweet and her minor children are survivors who may file an action arising out of the wrongful death of Daniel Shaver under Arizona law, including A.R.S. § 12-612.

178.   As a direct and proximate result of the wrongful acts, neglect or defaults of the Mesa Defendants as alleged herein, Daniel Shaver was physically assaulted, injured and died. The wrongful acts, neglect and defaults of the Mesa Defendants include all the actions alleged above, including without limitation:

a. The use of improper, excessive, unreasonable and illegal deadly force by Defendant Brailsford in shooting Daniel Shaver;

b. The use by the MPD officers responding to the La Quinta hotel on January 18, 2016 of overly aggressive, excessively forceful and escalated tactics in approaching Daniel Shaver and attempting to secure his arrest, and the failure to use techniques appropriate and proportionate to the facts and circumstances and designed to deescalate the situation and ensure the safe resolution of the matter without the need for discharge of weapons;

c. The use by the MPD officers interacting with Daniel Shaver of confusing and highly threatening instructions and commands, including commands that required him to move in ways that caused his shorts to fall and would necessitate his pulling them up;

d. The use by Defendant Langley of tactics and commands that encouraged the officers under his command to inaccurately view Daniel as a threat of serious

harm who deserved to be shot if he made any mistake in following Defendant Langley's commands, and to believe themselves authorized and commanded to shoot Daniel for any move they considered outside the strict confines of his commands;

e. The failure of the MPD officers to remove Ms. Portillo's purse from the hallway and their requirement that Daniel crawl over the purse, requiring of him movements that could be mistaken for threatening gestures;

f. The failure of the MPD officers to recognize and appreciate the submissive and compliant nature of Daniel's interactions with them and their decision to inappropriately treat his actions as hostile and threatening;

g. The failure of the MPD officers to deploy weaponry and tactics that were appropriate and reasonable for the true circumstances facing them at the La Quinta hotel on January 18, 2016;

h. The failure of the MPD officers to recognize that both Ms. Portillo and Daniel were unarmed; particularly that neither had a rifle which was the only type of weapon that had been described in the 911 call;

i. The failure of the MPD officers responding to the 911 call on January 18, 2016 to make proper and reasonable pre-apprehension inquiries of witnesses, hotel staff, and physical conditions at the hotel (such as the screen over Daniel's window), to appropriately assess the credibility of the 911 call, to accurately and reasonably assess the real level of threat or risk involved, and to understand the nature and demeanor of the likely occupants of Daniel Shaver's room, all of which would have resulted in the deployment of tactics and commands far different than the Defendants used thereby preventing Daniel from being shot and killed;

j. The failure of the City of Mesa and the MPD to properly train and supervise the Defendant officers who were present when Daniel Shaver was killed, including without limitation the failure to train and supervise them in investigation of

circumstances on a call, tactics, weaponry, approaches, verbal commands, use of lethal and non-lethal force and other techniques that would have allowed the officers to properly and reasonably assess the situation, to confirm that Daniel Shaver did not pose a threat of harm justifying his being shot or even his being targeted with multiple rifles and other weaponry while being verbally berated and threatened with being shot, and to deploy appropriate tactics and commands that would have avoided the killing of Daniel;

k. The failure of the City of Mesa and its supervisory MPD officials to identify the threats to public safety, and specifically the safety of Daniel Shaver and others at the La Quinta hotel, posed by Defendant Brailsford, including as a result of any history of use of excessive or inappropriate force or physical tactics and as indicated by the messages he had inscribed on the AR-15 he was using in his official duty, along with the failure of the City of Mesa and its supervisory MPD officials to take all necessary actions to eliminate those threats and protect members of the public including Daniel Shaver;

l. The failure of the City of Mesa and its supervisory MPD officials to take appropriate steps to limit or eliminate Defendant Brailsford's interactions as a police officer with the public, including without limitation their failure to exercise appropriate options for reassignment, sanctions, retraining, termination of employment or heightened supervision, given the hostile and threatening demeanor, attitude and actions he had displayed in prior activities as a police officer and by putting the aggressive and unprofessional inscriptions on his AR-15 service weapon.

m. The failure of Defendant Langley to properly supervise the MPD officers under his authority on January 18, 2016 and ensure that those officers employed appropriate policies, practices and supervision regarding the use of lethal force and other aggressive tactics implemented on January 18, 2016 in the MPD's interactions with Daniel Shaver, and his failure to ensure that Defendant

1    Brailsford did not employ unlawful, unnecessary, unreasonable or excessive

2    force against Daniel Shaver.

3    179.    The Mesa Defendants' actions and failures to act constitute negligence.

4    They also constitute intentional wrongful conduct and deliberate indifference to the rights of

5    Daniel Shaver and his surviving family.

6    180.    In addition to the intentional wrongful conduct and deliberate

7    indifference, the actions and failures to act alleged herein reflect that the Defendants engaged

8    in extreme and excessive cruelty to Daniel Shaver and the Plaintiffs, which constitutes reckless

9    indifference to the rights and safety of Daniel Shaver and the Plaintiffs that Defendants knew

10   or ought to have known.

11   181.    In addition to the intentional wrongful conduct and deliberate indifference, the

12   actions of the Defendants as alleged herein also constituted unnecessary and wanton infliction

13   of pain and suffering and created an unreasonable risk of harm to Daniel Shaver and the

14   Plaintiffs with the highly probable result that the harm would occur.

15   182.    As a direct and proximate result of the actions and failures to act of the Mesa

16   Defendants as alleged herein, including as alleged in the foregoing paragraphs under Count I,

17   the Plaintiffs suffered grave and devastating injuries and loss, including the loss of Daniel

18   Shaver's life.

19   183.    The losses suffered by the Plaintiffs as a result of the actions and failures to act

20   of the Mesa Defendants as alleged herein include Mrs. Sweet's loss of consortium and

21   companionship, love, support, help, and care of her husband, and her minor children's loss of

22   their father and his love, guidance, companionship, support, motivation, trust and all other

23   aspects of his loving and protective relationship with and care for them.

24   184.    The losses suffered by the Plaintiffs as a result of the actions and failures to act

25   of the Mesa Defendants as alleged herein include economic harms and losses.

26   185.    The Plaintiffs' economic harms and losses include harms and losses related to

27   the financial support Daniel Shaver did and would have provided to the Plaintiffs and the

28

disruptions caused by the death of someone the Plaintiffs were financially dependent upon. Such harms and losses include without limitation:

  a. lost earnings;

  b. lost future earnings and savings;

  c. costs associated with the death and cremation of Daniel;

  d. disruption of and negative impacts to Laney Sweet's ability to earn and her earnings; and

  e. loss of the ability to obtain benefits through Daniel Shaver and costs to be associated with replacing such benefits.

186. The losses suffered by the Plaintiffs as a result of the actions and failures to act of the Mesa Defendants as alleged herein include non-economic harms including emotional harm, pain and suffering, psychological injury, fear, stress, distress, despair, misery, depression, and anxiety, including harms that have occurred, are still occurring, and that are continuing. Such losses and harms also include the loss of enjoyment of life, and the loss of a sense of security and safety in the past, present and future.

187. The Plaintiffs are entitled to recover from the Mesa Defendants for all their losses and harms resulting from the wrongful death of Daniel Shaver and the wrongful acts, neglect and defaults of the Mesa Defendants as alleged herein.

188. The actions and failures to act of the Mesa Defendants alleged herein were evil, malicious and undertaken with the intent to harm Daniel Shaver and his family or with reckless disregard of the substantial risk of harm to Daniel Shaver and his family. The facts exhibit that the Mesa Defendants acted with an evil hand guided by an evil mind. The Plaintiffs' claims qualify, therefore, for the imposition of punitive or exemplary damages in an amount sufficient to punish the Defendants Brailsford, Langley, Doane, Elmore, Cochran, and Gomez and to deter other similarly situated persons from like conduct.

189. The Plaintiffs are entitled to recovery of taxable costs, including per the terms of A.R.S. § 12-341.

## COUNT II
### (Wrongful Death – A.R.S. § 12-611, *et seq.* – Against LQ Management L.L.C.)

**(Laney Sweet, E.S., N.S. – Plaintiffs)**

190.    The Plaintiffs reallege and incorporate as if set forth fully herein all the allegations from the paragraphs above.

191.    For purposes of this Count II, the Defendant "LQ Management L.L.C." means Defendant LQ Management L.L.C., along with any and all officers, employees, agents, servants, contractors or representatives of that entity or of the La Quinta hotel in Mesa, Arizona at which Daniel Shaver was killed, who participated in, facilitated, encouraged or was responsible for any of the actions or failures to act alleged herein as a basis for liability, including all such persons or entities whose specific identities and names are not yet known to Plaintiffs.

192.    On January 18, 2016, Daniel Shaver was a paying guest of the La Quinta hotel in Mesa, Arizona, and he and his wife and minor children were individuals to whom LQ Management and its agents and the La Quinta hotel and its agents, all under the management supervision of LQ Management, owed duties of care.

193.    LQ Management, through the actions and failures to act of its employee agents and those of its La Quinta hotel employee agents, breached its duties of care to Daniel Shaver and the Plaintiffs.  Among those duties were obligations to ensure that Daniel Shaver was protected from assault, battery or physical injury while on the La Quinta premises and to take all steps necessary to ensure that any MPD officials responding to the 911 call on January 18, 2016 were fully informed as the applicable circumstances and did not unnecessarily or unreasonably expose Daniel Shaver to risks of harm or death.

194.    Through the actions and failures to act alleged above, Defendant LQ Management facilitated, encouraged, and/or failed to prevent the use of excessive, unreasonable, and illegal force, resulting in Defendant Brailsford shooting and killing Daniel Shaver on January 18, 2016.

195.    The actionable actions or omissions of Defendant LQ Management include those matters alleged hereinabove, including without limitation:

a. The inaccurate and incomplete reporting by a La Quinta employee to a 911 operator of the circumstances surrounding the report of a weapon sited in a room;

b. The failure of La Quinta employees to fully and properly advise the MPD officials responding to the 911 call concerning their knowledge about Daniel Shaver, his personality and demeanor, his activities the evening before and the evening of the shooting, and that Daniel had just recently received a dinner order;

c. The failure of La Quinta employees to fully and properly advise the MPD officers responding to the 911 call of their own impressions of whether Daniel Shaver presented any sort of threat; and

d. The failure of the La Quinta employees to ensure that the MPD officers responding to the 911 call were aware that they had sent Ms. Jimenez up to Daniel's room after the report that resulted in the 911 call, and that they were aware of what Ms. Jimenez saw there.

196. On information and belief, LQ Management had inadequately trained and supervised its management and other staff about how to respond to circumstances like those at the Mesa La Quinta on the evening of January 18, 2016, in particular regarding how to interact with responding police and ensure they have full and accurate information.

197. On information and belief, LQ Management had inadequate policies and procedures established to ensure that its employees would fully and accurately advise responding police officers regarding all material circumstances concerning the hotel and its guests so that responding officers would not approach guests without complete and accurate information, so that such officers would accurately assess threats, and so that such officers would not make or act upon any false or misleading assumptions about the threat posed by a hotel guest and utilize inappropriate tactics or force.

198.    All of the actions or omissions alleged herein, including without limitation the failure to provide adequate training, supervision, policies and procedures, constituted a breach of LQ Management's duties to Daniel Shaver and the Plaintiffs.

199.    In addition to the intentional wrongful conduct and deliberate indifference, the actions and failures to act alleged herein reflect that the Defendant LQ Management through its agents  engaged in extreme and excessive cruelty to Daniel Shaver and the Plaintiffs, which constitutes reckless indifference to the rights and safety of Daniel Shaver and the Plaintiffs that Defendants knew or ought to have known.

200.    In addition to the intentional wrongful conduct and deliberate indifference, thehe actions of the Defendant LQ Management through its agents  as alleged herein also constituted unnecessary and wanton infliction of pain and suffering and created an unreasonable risk of harm to Daniel Shaver and the Plaintiffs with the highly probable result that the harm would occur.

201.    The Plaintiffs Laney Sweet and her minor children are survivors who may file an action arising out of the wrongful death of Daniel Shaver under Arizona law, A.R.S. § 12-612.

202.    On information and belief, as a direct and proximate result of the wrongful actions or failures to act of LQ Management alleged herein, Daniel Shaver was physically assaulted, injured and died.

203.    As a direct and proximate result of the actions and failures to act of LQ Management as alleged herein, the Plaintiffs suffered grave and devastating injuries and loss, including the loss of Daniel Shaver's life.

204.    The losses suffered by the Plaintiffs as a result of the actions and failures to act of LQ Management as alleged herein include Mrs. Sweet's loss of consortium and companionship, love, support, help, and care of her husband, and her minor children's loss of their father and his love, guidance, companionship, support, motivation, trust and all other aspects of his loving and protective relationship with and care for them.

205.    The losses suffered by the Plaintiffs as a result of the actions and failures to act of LQ Management as alleged herein include economic harms and losses.

206.    The Plaintiffs' economic harms and losses include harms and losses related to the financial support Daniel Shaver did and would have provided to the Plaintiffs and the disruptions caused by the death of someone the Plaintiffs were financially dependent upon. Such harms and losses include without limitation:

     a.   lost earnings;

     b.   lost future earnings and savings;

     c.   costs associated with the death and cremation of Daniel;

     d.   disruption of and negative impacts to Laney Sweet's ability to earn and her earnings; and

     e.   loss of the ability to obtain benefits through Daniel Shaver and costs to be associated with replacing such benefits.

207.    The losses suffered by the Plaintiffs as a result of the actions and failures to act of LQ Management as alleged herein include non-economic harms including emotional harm, pain and suffering, psychological injury, fear, stress, distress, despair, misery, depression, and anxiety, including harms that have occurred, are still occurring, and that are continuing. Such losses and harms also include the loss of enjoyment of life, and the loss of a sense of security and safety in the past, present and future.

208.    The Plaintiffs are entitled to recover from LQ Management for all their losses and harms resulting from the wrongful death of Daniel Shaver and the wrongful acts, neglect and defaults of LQ Management as alleged herein.

209.    On information and belief, the actions and failures to act of LQ Management alleged herein were malicious and undertaken with the reckless disregard of the substantial risk of harm to Daniel Shaver and his family. The Plaintiffs' claims qualify, therefore, for the imposition of punitive or exemplary damages in an amount sufficient to punish LQ Management and to deter other similarly situated persons from like conduct.

210.    The Plaintiffs are entitled to recovery of taxable costs, including per the terms of A.R.S. § 12-341.

## COUNT III

**(42 U.S.C. § 1983 – Violation of the Fourth and Fourteenth Amendments – Against All Mesa Defendants)**

**(Estate of Daniel Shaver – Plaintiff)**

211.    The Plaintiffs reallege and incorporate as if set forth fully herein all the allegations from the paragraphs above.

212.    As the surviving spouse and children of Daniel Shaver, the Plaintiffs have the authority to pursue claims under 42 U.S.C. § 1983 for violation by the Mesa Defendants of Daniel Shaver's clearly established constitutional rights.

213.    In committing the acts and failures to act alleged herein, the Mesa Defendants acted jointly and under color of state law to deprive Daniel Shaver and the Plaintiffs of their clearly established constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, including without limitation:

      a.   The right to be free from unreasonable search or unreasonable seizure;

      b.   The right to be free from the use of unreasonable, unjustified and excessive force;

      c.   The right to be free from deprivation of life, liberty or property without due process of law;

      d.   The right to be free from summary punishment;

      e.   The right to have governmental officers prevent the use of excessive force; and

      f.   The right to be free from arbitrary governmental activity which shocks the conscience of a civilized society.

214.    In taking the actions alleged hereinabove to take Daniel Shaver from his hotel room and place him under the custody and control of the responding MPD Officers, the Mesa Defendants acted under color of state law and conducted an unreasonable seizure of Daniel Shaver.

215.    In killing Daniel Shaver without provocation or justification, the Mesa Defendants acted under color of state law and conducted an unreasonable seizure of Daniel

Shaver and utilized unnecessary, unjustified, unreasonable and excessive force in violation of their legal duties and Mr. Shaver's and the Plaintiffs' rights.

216.    Based on all the circumstances and facts alleged hereinabove, the actions of the Mesa Defendants were not objectively reasonable under the circumstances and based upon the perspective of a reasonable officer at the scene.

217.    The Mesa Defendants other than Defendant Brailsford further violated the rights of Daniel Shaver because they failed to intervene and stop the overly aggressive, unjustified and confusing tactics being used by the individual Mesa Defendants outside Daniel Shaver's hotel room.

218.    The Mesa Defendants other than Defendant Brailsford further violated the rights of Daniel Shaver because they failed to intervene and take all appropriate actions to prevent Brailsford from shooting and killing Daniel Shaver.

219.    Defendant Langley is also individually liable as a supervisor who directly participated in the violation of constitutional rights alleged herein.

220.    The Mesa Defendants knowingly and deliberately conspired to deprive Daniel Shaver of his constitutional rights.

221.    In addition to the intentional wrongful conduct and deliberate indifference, the the actions and failures to act alleged herein additionally reflect that the Defendants engaged in extreme and excessive cruelty to Daniel Shaver, which constitutes reckless indifference to the rights and safety of Daniel Shaver that Defendants knew or ought to have known.

222.    In addition to the intentional wrongful conduct and deliberate indifference, he actions of the Defendants as alleged herein also constituted unnecessary and wanton infliction of pain and suffering and created an unreasonable risk of harm to Daniel Shaver with the highly probable result that the harm would occur.

223.    As a direct and proximate result of the violations alleged herein, Daniel Shaver suffered grave and devastating injuries and loss, including the loss of his life.

224.    The losses suffered by Daniel Shaver as a result of the actions and failures to act of the Mesa Defendants as alleged herein include economic harms and losses.

225.   The losses suffered by Daniel Shaver as a result of the actions and failures to act of the Mesa Defendants as alleged herein include non-economic harms including emotional harm, pain and suffering, psychological injury, fear, stress, distress, despair, misery, depression, and anxiety, the loss of his emotional bonds and love with his family, and his life.

226.   Daniel Shaver's estate is entitled to recover from the Mesa Defendants for all their losses and harms resulting from the wrongful death of Daniel Shaver and the wrongful acts, neglect and defaults of the Defendants as alleged herein.

227.   The actions and failures to act of the Mesa Defendants alleged herein were evil, malicious and undertaken with the intent to harm Daniel Shaver and his family or with reckless and callous indifference to the protected rights of Daniel Shaver, and with reckless and callous disregard of the substantial risk of harm to Daniel Shaver and his family.  The facts exhibit that the Mesa Defendants acted with an evil hand guided by an evil mind.  The Plaintiff's claims qualify, therefore, for the imposition of punitive or exemplary damages against Defendants Brailsford, Langley, Doane, Elmore, Cochran and Gomez in an amount sufficient to punish them and to deter other similarly situated persons from like conduct.

228.   The Plaintiffs are entitled to recover reasonable attorneys' fees and costs per 42 U.S.C. §§ 1983 and 1988, including expert fees.

229.

### COUNT IV
### (42 U.S.C. § 1983 – Violation of the First Amendment – Against All Mesa Defendants)

### (Laney Sweet, E.S., N.S. – Plaintiff)

230.   The Plaintiffs reallege and incorporate as if set forth fully herein all the allegations from the paragraphs above.

231.   Plaintiff Laney Sweet, for herself and on behalf of her minor children, has fought to obtain information uncovering the true and complete circumstances of her husband's killing and to expose the actions of the Defendants in connection therewith to the public scrutiny so essential in a functioning democracy to checking and improving the operations of government.

In doing so, Ms. Sweet has been exercising her rights to free speech and to petition the government for redress of grievances.

232.    On information and belief, to thwart efforts by any member of the public to expose their misconduct, the individual Mesa Defendants have conspired to create false and misleading reports concerning the events surrounding the killing of Daniel Shaver.

233.    Also on information and belief, the City of Mesa has refused Ms. Sweet's proper public records request for the full AXON video recordings of her husband's killing in an effort to prevent her from exercising fully her right to free speech and to petition the government.

234.    Also on information and belief, officials from the MPD, whose acts are those of the City of Mesa, acted consciously to spread false information about the killing of Daniel Shaver via press releases.

235.    On information and belief, the City of Mesa has conspired with or facilitated the actions of the Maricopa County Attorney in wrongfully precluding Ms. Sweet's access to the full AXON videos in violation of her first Amendment free speech rights and in violation of her rights under Arizona's public records and crime victim's rights laws.

236.    Also on information and belief, the City of Mesa has acted in retaliation for Ms. Sweet's diligence and outspokenness about the wrongful killing of her husband to preclude her access to the full AXON videos and prevent her from effectively countering its own false and unretracted allegations about the killing of Daniel Shaver.

237.    In committing the acts and failures to act alleged herein, the Mesa Defendants acted jointly and under color of state law to deprive Plaintiffs Laney Sweet and her minor children of their clearly established constitutional rights under the First Amendment to the United States Constitution, including without limitation the rights to speak freely about important operations of government and the right to petition their government to redress their grievances concerning the killing of Daniel Shaver and the wrongful conduct of the MPD and it officers in connection therewith.

238.    In addition to the intentional wrongful conduct and deliberate indifference, the actions and failures to act alleged herein additionally reflect that the Defendants engaged in

1  extreme and excessive cruelty to the Plaintiffs, which constitutes reckless indifference to the

2  rights of the Plaintiffs that Defendants knew or ought to have known.

3          239.    In addition to the intentional wrongful conduct and deliberate

4  indifference, the actions of the Defendants as alleged herein also constituted unnecessary and

5  wanton infliction of pain and suffering and created an unreasonable risk of harm to the

6  Plaintiffs with the highly probable result that the harm would occur.

7          240.    As a direct and proximate result of the violations alleged herein, the Plaintiffs

8  have suffered grave and devastating injuries and loss.

9          241.    The losses suffered by the Plaintiffs as a result of the actions and failures to act

10  of the Mesa Defendants as alleged herein include the obstruction of Plaintiffs' First

11  Amendment rights, as well as all economic harms and losses associated with Plaintiff Laney

12  Sweet attempting to enforce her First Amendment rights, including without limitation any

13  expenses or lost income related thereto.

14          242.    The losses suffered by the Plaintiffs as a result of the actions and failures to act

15  of the Mesa Defendants as alleged herein include non-economic harms including emotional

16  harm, pain and suffering, psychological injury, fear, stress, distress, despair, misery,

17  depression, and anxiety, including harms that have occurred, are still occurring, and that are

18  continuing.  Such losses and harms also include the loss of enjoyment of life, and the loss of a

19  sense of security and safety in the past, present and future.

20          243.    The Plaintiffs suffered severe emotional distress as a result of the actions and

21  omissions of Defendants and the myriad and compounded harms caused thereby.

22          244.    The Plaintiffs are entitled to recover from the Defendants for all their losses and

23  harms resulting from the violation of their First Amendment rights as alleged herein.

24          245.    The actions and failures to act of the Mesa Defendants alleged herein were evil,

25  malicious and undertaken with the intent to harm Daniel Shaver and his family or with

26  reckless and callous indifference to the protected rights of the Plaintiffs and Daniel Shaver,

27  and with reckless and callous disregard of the substantial risk of harm to Daniel Shaver and his

28  family. The facts exhibit that the Mesa Defendants acted with an evil hand guided by an evil

mind. The Plaintiffs' claims qualify, therefore, for the imposition of punitive or exemplary damages against Defendants Brailsford, Langley, Doane, Elmore, Cochran, and Gomez, in an amount sufficient to punish them and to deter other similarly situated persons from like conduct.

246.   The Plaintiffs are entitled under 42 U.S.C. §§ 1983 and 1988 to recover their reasonable attorneys' fees and costs, including expert fees.

## COUNT V
### (Conspiracy to Interfere with Civil Rights – Against All Mesa Defendants)

### (Laney Sweet, E.S., N.S. – Plaintiff)

247.   The Plaintiffs reallege and incorporate as if set forth fully herein all the allegations from the paragraphs above.

248.   As alleged hereinabove, on information and belief the individual Mesa Defendants conspired, agreed or took actions designed to: 1) limit the disclosure of complete information about the killing of Daniel Shaver; 2) construct a narrative or story for the killing that is incomplete, inaccurate, false or misleading; 3) prepare official reports or make statements and provide testimony about the events leading up to, involving or following the killing of Daniel Shaver that are inaccurate, incomplete or misleading; 4) violate the policies and practices of the MPD that are designed to prevent officer collusion and ensure full and accurate recording and investigation of events in officer-involved shootings; 5) limit access to information concerning the killing of Daniel Shaver to Daniel's widow and children; and/or 6) take actions that would slow, limit or impair investigation into the conduct of MPD officers or agents including Defendants Brailsford, Langley, Doane, Elmore, Cochran and Gomez involved in the killing of Daniel Shaver and thereby shield MPD officer or agents from administrative, criminal or civil proceedings or liability through false, misleading, incomplete or otherwise wrongfully obstructive conduct.

249.   The actionable actions and omissions of the Mesa Defendants include without limitation omitting material facts from the reports of officers present at the shooting of Daniel Shaver, including without limitation full and accurate descriptions of Daniel's  crying and

begging not to be shot, his repeated, attempted compliance with Defendant Langley's instructions, his submissive and compliant attitude and actions, his presentation as an unarmed individual, and the fact that his shorts were falling off while he moved down the hallway under the MPD commands.

250.   The actionable actions and omissions of the Mesa Defendants further include without limitation officers present at the shooting of Daniel Shaver omitting from their reports accurate and detailed descriptions of Defendant Langley's aggressive and confusing verbal commands.

251.   The actionable actions and omissions of the Mesa Defendants further include without limitation officers present at the shooting of Daniel Shaver including in their official reports parallel allegations about perceived threats created by Daniel that are without basis, contradict the facts of the shooting and Daniel's actual actions, demeanor and compliance with MPD commands.

252.   The actionable actions and omissions of the Mesa Defendants further include without limitation the failure of MPD officials to comply with the MPD policies and procedures for officer-involved shootings, including the MPD officials' violations of the policy regarding segregation of the officers involved in the shooting, and, on information and belief, the violation of the MPD policy prohibiting an officer involved in a shooting from contacting family members before they have been fully and appropriately interviewed.

253.   The actionable actions and omissions of the Mesa Defendants include the failure of MPD officials to inform Plaintiff Laney Sweet of her husband's killing, their failure to respond to her inquiries for information about her husband, and their failure to provide her access to the full AXON videos in response to her public records request.

254.   The actions and omissions of the Mesa Defendants, as alleged herein, have frustrated and prejudiced the Plaintiffs' rights and abilities to:

    a.   fully understand the circumstances under which Daniel Shaver was killed;

    b.   to obtain all relevant evidence concerning the failures of the Defendants and other MPD officials to honor their duties to Daniel Shaver and the Plaintiffs;

c. to obtain all relevant evidence and concerning the violations of Daniel Shaver's and the Plaintiffs' legal rights by the Defendants or other MPD officials;

d.  to participate in the criminal prosecution of Defendant Brailsford as they are specifically entitled as Arizona crime victims;

e. to advocate for the criminal prosecution or civil or administrative discipline, sanction or license revocation of Defendant Brailsford, the other individual Defendants, or other officials of the MPD;

f. to understand the operation of government officials of the MPD in the killing of Daniel Shaver; and

g. to pursue all appropriate civil remedies arising out of the treatment of Daniel Shaver by the Defendants.

255.   On information and belief, the actions and omissions of the Mesa Defendants as alleged herein have obstructed justice and limited, impaired or frustrated the full and fair investigation and prosecution of criminal activity by individual MPD officials for which the Plaintiffs and Daniel Shaver are victims in violation of federal laws including 42 U.S.C. § 1983 and 42 U.S.C. § 1985.

256.   On information and belief, the actions and omissions of the Mesa Defendants as alleged herein have obstructed justice and limited, impaired or frustrated the full and fair investigation of activity by the Mesa Defendants and/or other MPD officials that should lead to appropriate civil and administrative sanctions or punishment, including without limitation, license revocation or suspension, for persons involved in the killing of Daniel Shaver or in the creation of incomplete, false, or misleading reports concerning his killing in violation of federal laws including 42 U.S.C. § 1983 and 42 U.S.C. § 1985.

257.   The actions and omissions of the Mesa Defendants as alleged herein have obstructed the First Amendment free speech rights of the Plaintiffs by precluding them from obtaining the information and evidence needed for their speech concerning the killing of Daniel Shaver, including all public speech by Plaintiffs, speech made to criminal investigatory

1   and prosecutorial bodies and officials, and speech to be made to or in support of any

2   administrative or civil actions against the City of Mesa, MPD or any MPD officials in

3   violation of federal laws including 42 U.S.C. § 1983 and 42 U.S.C. § 1985.

4       258.    As a direct and proximate result of the violations alleged herein, the Plaintiffs

5   suffered grave and devastating injuries and loss.

6       259.    The losses suffered by the Plaintiffs as a result of the actions and failures to act

7   of the Mesa Defendants as alleged herein include all economic harms related to Plaintiffs

8   having to devote time, effort and resources to pursuing the full truth concerning the killing of

9   Daniel Shaver and all evidence related thereto (including costs and lost income).

10      260.    The losses suffered by the Plaintiffs as a result of the actions and failures to act

11  of the Mesa Defendants as alleged herein also include non-economic harms including

12  emotional harm, pain and suffering, psychological injury, fear, stress, distress, despair, misery,

13  depression, and anxiety, including harms that have occurred, are still occurring, and that are

14  continuing.  Such losses and harms also include the loss of enjoyment of life, and the loss of a

15  sense of security and safety in the past, present and future.

16      261.    The Plaintiffs are entitled to recover from the Mesa Defendants for all their

17  losses and harms resulting from the wrongful acts, neglect and defaults of the Defendants as

18  alleged herein

19      262.    The actions and failures to act of the Mesa Defendants alleged herein were evil,

20  malicious and undertaken with the intent to harm Daniel Shaver and his family or with

21  reckless and callous indifference to the protected rights of the Plaintiffs and Daniel Shaver,

22  and with reckless and callous disregard of the substantial risk of harm to Daniel Shaver and his

23  family.  The facts exhibit that the Mesa Defendants acted with an evil hand guided by an evil

24  mind.  The Plaintiffs' claims qualify, therefore, for the imposition of punitive or exemplary

25  damages against Defendants Brailsford, Langley, Doane, Elmore, Cochran, and Gomez,  under

26  42 U.S.C. §§ 1983, 1985 and 1988 in an amount sufficient to punish these Defendants and to

27  deter other similarly situated persons from like conduct.

28

263.    The Plaintiffs are entitled under 42 U.S.C. §§ 1983, 1985 and 1988 to recover their reasonable attorneys' fees and costs, including expert fees.

## COUNT VI
**(Intentional Infliction of Emotional Distress – the Mesa Defendants)**

**(Laney Sweet, E.S., N.S., & Estate of Daniel Shaver – Plaintiffs)**

264.    The Plaintiffs reallege and incorporate as if set forth fully herein all the allegations from the paragraphs above.

265.    In committing the acts and failures to act alleged herein, the Mesa Defendants acted jointly and under color of state law to deprive Daniel Shaver and the Plaintiffs of their clearly established constitutional rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

266.    Per the actions and failures to act alleged herein, the Mesa Defendants engaged in extreme and excessive cruelty to Daniel Shaver and the Plaintiffs, which constitutes extreme and outrageous conduct.

267.    The actions of the Mesa Defendants as alleged herein constituted unnecessary and wanton infliction of pain and suffering and were conducted either or both with intent to cause emotional distress to Plaintiffs or recklessly disregarding the near certainty that such emotional distress would result.

268.    The Mesa Defendants acted maliciously by undertaking, without just cause, a course of action that was intended to cause extreme pain and suffering.

269.    The Mesa Defendants further acted maliciously by undertaking, without just cause, a course of action that was intended to deprive Plaintiffs of necessary information about the death of Daniel Shaver, including information necessary to exercise their First Amendment rights and statutory and constitutional victims' rights to defend him and seek vindication and justice for him and themselves.

270.    As a direct and proximate result of the violations alleged herein, the Plaintiffs suffered grave and devastating injuries and loss.

271.    The Plaintiffs suffered severe emotional distress as a result of the actions and omissions of Mesa Defendants and the myriad and compounded harms caused thereby.

272.    The losses suffered by the Plaintiffs as a result of the actions and failures to act of the Mesa Defendants as alleged herein include non-economic harms including emotional harm, pain and suffering, psychological injury, fear, stress, distress, despair, misery, depression, and anxiety, including harms that have occurred, are still occurring, and that are continuing.  Such losses and harms also include the loss of enjoyment of life, and the loss of a sense of security and safety in the past, present and future.

273.    The Plaintiffs are entitled to recover from the Mesa Defendants for all their losses and harms resulting from the wrongful acts, neglect and defaults of the Mesa Defendants as alleged herein

274.    The actions and failures to act of the Mesa Defendants alleged herein were evil, malicious and undertaken with the intent to harm Daniel Shaver and his family or with reckless disregard of the substantial risk of harm to Daniel Shaver and his family.  The facts exhibit that the Mesa Defendants acted with an evil hand guided by an evil mind. To the extent that such actions and failures were outside the scope of the Defendants Brailsford, Langley, Doane, Elmore, Cochran, and Gomez's employment, the Plaintiffs' claims qualify, therefore, for the imposition of punitive or exemplary damages in an amount sufficient to punish Defendants Brailsford, Langley, Doane, Elmore, Cochran, and Gomez, and to deter other similarly situated persons from like conduct.

275.    The Plaintiffs are entitled to recovery of taxable costs, including per the terms of A.R.S. § 12-341.

276.

277.

278.

**COUNT VII**
**(Assault – Mesa Defendants)**

**(Estate of Daniel Shaver – Plaintiff)**

279.   The Plaintiffs reallege and incorporate as if set forth fully herein all the allegations from the paragraphs above.

280.   The apprehension and shooting of Daniel Shaver constitutes an assault in that it placed Mr. Shaver under fear of imminent physical injury and death.

281.   The assault of Daniel Shaver was not justified.

282.   The assault injured Daniel Shaver by causing him non-economic psychological and emotional harms and trauma of the sorts specified in the counts above, such as in Counts I and II.   The Mesa Defendants' conduct therefore was the direct and proximate cause of injuries to Mr. Daniel Shaver.

283.   The actions and failures to act of the Mesa Defendants alleged herein were evil, malicious and undertaken with the intent to harm Daniel Shaver or with reckless disregard of the substantial risk of harm to Daniel Shaver. The facts exhibit that Defendants acted with an evil hand guided by an evil mind. To the extent that such actions and failures were outside the scope of the Defendants Brailsford's, Langley's, Doane's, Elmore's, Cochran's, and Gomez's employment, the Plaintiffs' claims qualify, therefore, for the imposition of punitive or exemplary damages in an amount sufficient to punish the Defendants Brailsford, Langley, Doane, Elmore, Cochran, and Gomez, and to deter other similarly situated persons from like conduct.

284.   Plaintiff is entitled to recovery of taxable costs, including per the terms of A.R.S. § 12-341.

**COUNT IIX**
**(Battery – the Mesa Defendants)**

**(Estate of Daniel Shaver – Plaintiff)**

285.   The Plaintiffs reallege and incorporate as if set forth fully herein all the allegations from the paragraphs above.

286.   The apprehension and shooting of Daniel Shaver constitutes a battery against Mr. Shaver in that it caused direct physical injury to Mr. Shaver.

287.   The battery against Daniel Shaver was not justified.

288.   The battery injured Daniel Shaver and caused him non-economic psychological and emotional harms and trauma of the sorts specified in the counts above, such as in Counts I and II. The Mesa Defendants' conduct therefore was the direct and proximate cause of injuries to Mr. Daniel Shaver.

289.   The actions and failures to act of the Mesa Defendants alleged herein were evil, malicious and undertaken with the intent to harm Daniel Shaver or with reckless disregard of the substantial risk of harm to Daniel Shaver. The facts exhibit that Defendants acted with an evil hand guided by an evil mind. To the extent that such actions and failures were outside the scope of the Defendants Brailsford's, Langley's, Doane's, Elmore's, Cochran's, and Gomez's employment, the Plaintiffs' claims qualify, therefore, for the imposition of punitive or exemplary damages in an amount sufficient to punish Defendants Brailsford, Langley, Doane, Elmore, Cochran, and Gomez, and to deter other similarly situated persons from like conduct.

290.   Plaintiff is entitled to recovery of taxable costs, including per the terms of A.R.S. § 12-341.

## COUNT IX
### (Violation of Arizona Public Records Laws – City of Mesa)

### (Laney Sweet – Plaintiff)

291.   The Plaintiffs reallege and incorporate as if set forth fully herein all the allegations from the paragraphs above.

292.   On February 6, 2016, Plaintiff Laney Sweet through her attorney requested from Defendant City of Mesa copies of all AXON body camera videos from officers involved in the incident or investigation.

293.   Defendant City of Mesa never responded to that request for what is a public record under Arizona's statutes.

294.   Defendant City of Mesa did provide responsive material to other public records requested by Plaintiff Laney Sweet, thus, it did receive and was aware of her public records requests, including the request for the AXON body camera video.

295.   Included in the AXON body camera videos are videos taken by the body cameras worn by Defendants Brailsford and Doane recording the threatening, confusing, bullying, and unlawful behavior of the Defendant MPD officers that Daniel was subjected to.

296.   Included in the AXON body camera videos are videos taken by the body cameras worn by Defendants Brailsford and Doane recording the shooting and killing of Daniel, and any gestures or movements made by Daniel prior to the killing that Defendants, pursuant to the additional legal violations outlined above, described generically as threatening while omitting Daniel's confusion, pleas not to be killed, and crying.

297.   Because Defendant City of Mesa withheld and facilitated the withholding of the AXON body camera videos, Plaintiffs cannot know the information contained on the portions of the AXON body cameras that have been withheld and have now been improperly sealed by the Maricopa County Superior Court, including many levels of audio and video information critical to understanding the individual Defendants' behaviors.

298.   Because Defendant City of Mesa withheld and facilitated the withholding of the AXON body camera videos, Plaintiffs were unable to fully and effectively exercise their First Amendment and state constitutional free speech rights and to thereby vindicate and seek justice for Daniel, effectively defend and vindicate Daniel against the disparaging statements made by Defendant Mesa in its press release asserting that Defendant Brailsford shot and killed Daniel in response to a threat, and effectively contradicting the disparaging statements of the Mesa Police Association incorrectly blaming Daniel's behavior for the shooting and callously asserting that he "paid the price."

299.   Because Defendant City of Mesa withheld and facilitated the withholding of the AXON body camera videos, Plaintiff Laney Sweet was unable to engage in informed conversations and decisions related to the prosecution of Defendant Philip Brailsford in his criminal proceeding, was unable to pursue and enforce her crime victim's rights under Arizona law, and was even prejudiced in later pursuing her arguments against any further protective order concerning portions of the AXON video evidence.

300.    The City of Mesa's violation of Arizona's public records law has caused substantial injury and loss to the Plaintiffs, including by depriving them of their rights under the Arizona public records laws and prejudicing and impairing their rights under the Arizona crime victim's rights laws.  The City of Mesa's actions have directly and proximately caused emotional, psychological and other non-economic pain and suffering injuries to the Plaintiffs, and, on information and belief, will cause further such harm and suffering.

301.    Per the rights conferred by Arizona law, including by A.R.S. § 39.121.02(C), Plaintiffs are entitled to full relief and recovery against the City of Mesa for all such injuries, as well as any associated economic harms that may result from the non-economic harms suffered by Plaintiffs.

302.    The Plaintiffs are entitled to permanent injunctive relief enforcing the City of Mesa's obligations to them under the Arizona public records laws.

303.    The Plaintiffs are further entitled to recover their reasonable attorneys' fees and costs pursuant to A.R.S. § 39.121.02 and A.R.S. § 12-341.

## COUNT X
### (Violation of Arizona Crime Victims' Rights – City of Mesa)

### (Laney Sweet, E.S., N.S. – Plaintiffs)

304.    The Plaintiffs reallege and incorporate as if set forth fully herein all the allegations from the paragraphs above.

305.    On February 6, 2016, Plaintiff Laney Sweet through her attorney requested from Defendant City of Mesa copies of all AXON body camera videos from officers involved in the incident or investigation.

306.    Defendant City of Mesa never responded to that request for what is a public record under Arizona's statutes.

307.    Defendant City of Mesa did provide responsive material to other public records requested by Plaintiff Laney Sweet, thus, it did receive them and know of her requests, including the request for the AXON body camera video.

308.   Included in the AXON body camera videos are videos taken by the body cameras worn by Defendants Brailsford and Doane recording the threatening, confusing, bullying, and unlawful behavior of the Defendant MPD officers that Daniel was subjected to.

309.   Included in the AXON body camera videos are videos taken by the body cameras worn by Defendants Brailsford and Doane recording the shooting and killing of Daniel, and any gestures or movements made by Daniel prior to the killing that Defendants, pursuant to the additional legal violations outlined above, described generically as threatening while omitting Daniel's confusion, pleas not to be killed, and crying.

310.   Because Defendant City of Mesa withheld and facilitated the withholding of the AXON body camera videos, Plaintiffs cannot know the information contained on the portions of the AXON body cameras that have been withheld and have now been improperly sealed by the Maricopa County Superior Court, including many levels of audio and video information critical to understanding the individual Defendants' behaviors.

311.   Because Defendant City of Mesa withheld and facilitated the withholding of the AXON body camera videos, Plaintiffs were unable to fully and effectively exercise their rights as set forth in the Arizona Crime Victim's Bill of Rights, Ariz.Const., art. II, § 2.1, the Arizona statutes granting rights to victims of crimes, *see, e.g.,* A.R.S. § 13-4401, *et seq.*, and the rules protecting and granting rights to Arizona crime victims under the Arizona Rules of Criminal Procedure, namely, Rule 39.

312.   As crime victims in Arizona, Plaintiff Laney Sweet and her children have various rights guaranteed under the Arizona Constitution, Chapter 40 of Title 13 of the Arizona Revised Statutes (A.R.S. § 13-4401, *et seq.*), and Rule 39, Ariz.R.Crim.P.  Those include, without limitation, a constitutional right "[t]o be treated with fairness, respect, and dignity, and to be free from intimidation, harassment, or abuse, throughout the criminal justice process." Ariz. Const. Art. 2, § 2.1(A)(1).

313.   As crime victims in Arizona, Plaintiff Laney Sweet and her children have a constitutional right "[t]o be heard at any proceeding involving a post-arrest release decision, a negotiated plea, and sentencing." Ariz. Const. Art. 2, § 2.1(A)(4).

314.    As crime victims in Arizona, Plaintiff Laney Sweet and her children have a right "[t]o confer with the prosecution, after the crime against the victim has been charged, before trial or before any disposition of the case . . . ." Ariz. Const. Art. 2, § 2.1(A)(6).

315.    Plaintiff Laney Sweet and her children have similar rights under A.R.S. § 13-4401, *et seq.*, including without limitation, rights to appear and participate at various stages of any criminal proceeding for Defendant Brailsford, *see* A.R.S. §§ 13-4426.01, 13-4437(D), the right to confer meaningfully with the prosecutor concerning various aspects of the disposition of the criminal charges against Defendant Brailsford, *see* A.R.S. § 13-4419, the right to be heard and participate in plea issues, *see* A.R.S. § 13-4423, the right to be heard at any sentencing proceeding, A.R.S. § 13-4426.01, and the right to appear and address the court and to "present evidence, information and opinions that concern the criminal offense, the defendant, the sentence or the need for restitution at any aggravation, mitigation, presentencing or sentencing proceeding," A.R.S. § 13-4426.

316.    Plaintiffs are unable to fully and effectively exercise their rights under the Arizona victim's crime laws and rules because Defendant City of Mesa withheld and facilitated the withholding of the AXON body camera video and audio footage that is now sealed by the Maricopa County Superior Court.

317.    More specifically, Plaintiff Laney Sweet was unable and remains unable to engage meaningfully in fully informed conversations and decisions related to the prosecution of Defendant Philip Brailsford in his criminal proceeding to which she is legally entitled as outlined above. Upon information and belief, the withholding alleged herein was in fact an intentional and knowing act or failure to act by Defendant City of Mesa.

318.    As a result of the actions and failures to act alleged herein regarding release of the AXON videos, Defendant City of Mesa at a minimum engaged in intentional, knowing or grossly negligent violation of the victim's rights of the Plaintiffs under the Arizona Constitution, the Arizona crime victim's rights statutes, and the Arizona Rules of Criminal Procedure.

319.    The City of Mesa's violation of Arizona's public records law has directly and proximately interfered with and prevented the Plaintiffs from exercising fully their rights as crime victims under the Arizona Constitution, statutes, and Rules of Criminal Procedure.  This has caused substantial injury and loss to the Plaintiffs, including by depriving them of and impairing their rights under the Arizona crime victim's rights laws.  The City of Mesa's actions have directly and proximately caused emotional, psychological and other non-economic pain and suffering injuries to the Plaintiffs, and, on information and belief, will cause further such harm and suffering.

320.    Per the rights conferred by Arizona law, including by A.R.S. § 13-4437, Plaintiffs are entitled to full relief and recovery against the City of Mesa for all such injuries, as well as any associated economic harms that may result from the non-economic harms suffered by Plaintiffs.

321.    The Plaintiffs are entitled to permanent injunctive relief enforcing the City of Mesa's obligations to them under the Arizona crime victim's rights laws.

322.    The Plaintiffs are entitled to recovery of taxable costs, including per the terms of A.R.S. § 12-341.

### DEMAND FOR JURY TRIAL

323.    Plaintiffs demand a jury trial for all claims, causes of action, matters and issues triable to a jury.

WHEREFORE, based on the claims alleged herein, the Plaintiffs respectfully request entry of a judgment in favor of the Plaintiffs and against the Defendants, jointly and severally, on the following terms:

    A.    Awarding the Plaintiffs all their damages, including all actual, compensatory, consequential and incidental damages, in an amount to be proven at trial but no less than $75 million;

    B.    Awarding the Plaintiffs appropriate permanent injunctive relief necessary to enforce their rights under the Arizona public records and crime victim's rights laws;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

C.    Awarding the Plaintiffs punitive or exemplary damages against all eligible Defendants in amounts sufficient to punish the Defendants and to deter similarly situated persons from like conduct;

D.    Awarding the Plaintiffs their reasonable attorneys' fees and taxable costs to the fullest extent allowed by applicable federal or state law, including without limitation those applicable provisions of 42 U.S.C. §§ 1983, 1985, 1988, A.R.S. § 12-341, and A.R.S. § 39.121.02(B);

E.    Awarding the Plaintiffs interest on all sums from the earliest dates and at the highest rates allowed by law;

F.    Awarding the Plaintiffs all such other relief, at law or in equity, that the Court deems just and proper.

DATED this 22nd day of August, 2017.


BASKIN RICHARDS PLC


 /s/ David E. Wood_____
William A. Richards
David E. Wood
Leslie Ross
2901 North Central Avenue, Suite 1150
Phoenix, Arizona 85012

GERAGOS & GERAGOS APC
Mark Geragos
Benjamin Meiselas
644 S. Figueroa St.
Los Angeles, CA  90017

*Attorneys for Plaintiffs*

1

**CERTIFICATE OF SERVICE**

2

3

I hereby certify that on August 22, 2017 I transmitted the attached document to the Clerk's Office using the CM/ECF system for filing to:

4

5  Kathleen L. Wieneke
Christina Retts

6  STRUCK WIENEKE & LOVE, PLC
3100 W. Ray Road, Suite 300

7  Chandler, AZ  85226
*Attorneys for Defendants*

8  *City of Mesa, Officer Brian*
*Elmore, Officer Christopher*

9  *Doane, Officer Richard*
*Gomez, and Officer Bryan*

10  *Cochran*

11  Daniel O'Connor
Justin Holm

12  O'CONNOR & CAMPBELL
7955 S. Priest Drive

13  Tempe, AZ  85284

14  *Attorneys for Defendants Philip*
*Brailsford and Corrine Brailsford*

15

16  Mark Zukowski
David Potts

17  Jonathan Barnes
JONES, SKELTON & HOCHULI, PLC

18  40 N. Central Avenue, Suite 2700

19  Phoenix, AZ 85004
*Attorney for Defendant La Quinta Holdings*

20

21  James Belanger
J. BELANGER LAW PLLC

22  PO Box 447
Tempe, AZ  85280

23  *Attorney for Defendant Charles Langley*

24

Sven K. Budge

25  BUDGE LAW FIRM, PLLC
1134 E. University Dr., Suite 121

26  Mesa, AZ  85203

27  *Attorney for Plaintiffs Grady and Norma Shaver*

28  /s/ Cristina McDonald